The **AUTHORS LEAGUE OF AMERICA, INC.** and **Irwin Karp**, Plaintiffs,

v.

The **ASSOCIATION OF AMERICAN PUBLISHERS**, Plaintiff-Intervenor,

v.

**David L. LADD**, Register of Copyrights, **James Baker**, Secretary of the Treasury, and **William Von Raab**, Commissioner, United States Customs Service, Defendants.

No. 82 Civ. 5731 (GLG).

United States District Court, S.D. New York.

Oct. 8, 1985.

800

Irwin Karp, Port Chester, N.Y., for plaintiff, The Authors League of America, Inc., and pro se.

Paskus, Gordon & Mander, New York City, for plaintiff-intervenor; David S. Klafter, of counsel.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., New York City by Frederick M. Lawrence, Jane E. Booth, Asst. U.S. Attys., for defendants.

Brown, Wood, Ivey, Mitchell & Petty, New York City by James K. Manning, and Loomis, Owen, Fellman & Howe, Washington, D.C. by Stephen F. Owen, Jr., James E. Anderson, Richard B. Fellows, Jr., for amici curiae, Book Mfrs.' Institute, Inc., Printing Indus. of America, Inc., and Graphic Communications Intern. Union.

## OPINION

GOETTEL, District Judge:

In this action, the plaintiffs seek to challenge the constitutionality of the manufacturing clause of the Copyright Act ("the Act"), 17 U.S.C. §§ 601–603 (1982). That clause forbids the importation or public distribution in the United States of certain copyright publications of American authors or domiciliaries that are manufactured abroad.

The defendants have moved to dismiss the action or, alternatively, for summary judgment. The plaintiffs and plaintiff-intervenor have cross-moved for summary judgment. For the reasons set forth below, the Court grants the defendants' motion for summary judgment and denies the plaintiffs' and the plaintiff-intervenor's cross-motion.

## I. BACKGROUND

### A. Statutory Scheme

The manufacturing clause of the Copyright Act is contained in sections 601 and 603(a) and (c) of Title 17 of the United States Code. Sections 601 and 603(a) and (c) were enacted on October 19, 1976, as part of the Copyright Revision Act, Pub.L. 94–553, 90 Stat. 2588–90 (1976).[1] Section 601 provides:

> Prior to July 1, 1986, and except as provided by subsection (b), the importation into or public distribution in the United States of copies of a work consisting preponderantly of nondramatic literary material that is in the English language and is protected under this title is prohibited unless the portions consisting of such material have been manufactured in the United States or Canada.

17 U.S.C. § 601 (1982). This section applies only to nondramatic work that is written mainly in the English language. It does not apply to nondramatic works in other languages, nor does it apply to films, music, plays, art or other categories of nonliterary copyrighted works. Section 601(b) outlines further situations in which the prohibition of section 601(a) does not apply. For example, the prohibition does not apply if the author is a foreigner domiciled abroad or a United States author domiciled abroad for at least a year prior to the importation of the foreign-made copies. 17 U.S.C. § 601(b)(1) (1982). Also, up to 2,000 copies of a nondramatic literary work in English by a United States national or domiciliary can be imported if an import statement is issued by the Copyright Office. 17 U.S.C. § 601(b)(1) (1982).[2]

---

**1.** Section 601 by its terms expired on July 1, 1982. On July 13, 1982, however, it was retroactively extended until July 1, 1986.

**2.** Section 601(b) provides in full as follows:

The provisions of subsection (a) do not apply—

(1) where, on the date when importation is sought or public distribution in the United States is made, the author of any substantial part of such material is neither a national nor a domiciliary of the United States or, if such author is a national of the United States, he or she has been domiciled outside the United States for a continuous period of at least one year immediately preceding that date; in the case of a work made for hire, the exemption

provided by this clause does not apply unless a substantial part of the work was prepared for an employer or other person who is not a national or domiciliary of the United States or a domestic corporation or enterprise;

(2) where the United States Customs Service is presented with an import statement issued under the seal of the Copyright Office, in which case a total of no more than two thousand copies of any one such work shall be allowed entry; the import statement shall be issued upon request to the copyright owner or to a person designated by such owner at the time of registration for the work under section 408 or at any time thereafter;

(3) where importation is sought under the authority or for the use, other than in schools,

The prohibition of section 601 is enforced by the provisions of section 603. Section 603(a) authorizes the Secretary of the Treasury to make regulations for the enforcement of the import prohibition.[3] Section 603(c) provides for the disposition of items imported in violation of section 601.[4]

### B. Background Facts

In the summer of 1982, plaintiffs The Authors League of America, Inc. ("Authors League"), and Irwin Karp ("Karp") had 6,000 copies of a pamphlet written by Karp, entitled *Fundamental Requirements of the New Copyright Act,* printed in England by Collyer MacDonald Limited. The Authors League sent that firm a check for 300 and 50/100 pounds sterling in payment for manufacturing the copies. (The publication was prepared in this fashion to create a test case.)

On August 16, 1982, Karp requested that the United States Copyright Office issue import statements to him and the Authors League, each to cover 3,000 copies of the pamphlet. The Copyright Office refused to issue the two import statements because the pamphlet fell into a category of material, the importation or distribution of which was forbidden by the Act.

The 6,000 copies of the pamphlet are being held by an English citizen who is awaiting shipping instructions from the Authors League and Karp. If the copies are shipped to the Authors League and Karp, they will be subject to seizure by the United States Customs Service, pursuant to the provisions of sections 603(a) and (c). They will then be destroyed or returned to England. The Authors League and Karp contend that if the manufacturing clause is declared unconstitutional, they will cause the 6,000 copies to be shipped to them in New York for distribution to members of

of the Government of the United States or of any State or political subdivision of a State;

(4) where importation, for use and not for sale, is sought—

(A) by any person with respect to no more than one copy of any work at any one time;

(B) by any person arriving from outside the United States, with respect to copies forming part of such person's personal baggage; or

(C) by an organization operated for scholarly, educational, or religious purposes and not for private gain, with respect to copies intended to form a part of its library;

(5) where the copies are reproduced in raised characters for the use of the blind; or

(6) where, in addition to copies imported under clauses (3) and (4) of this subsection, no more than two thousand copies of any one such work, which have not been manufactured in the United States or Canada, are publicly distributed in the United States; or

(7) where, on the date when importation is sought or public distribution in the United States is made—

(A) the author of any substantial part of such material is an individual and receives compensation for the transfer or license of the right to distribute the work in the United States; and

(B) the first publication of the work has previously taken place outside the United States under a transfer or license granted by such author to a transferee or licensee who was not a national or domiciliary of the United States or a domestic corporation or enterprise; and

(C) there has been no publication of an authorized edition of the work of which the copies were manufactured in the United States; and

(D) the copies were reproduced under a transfer or license granted by such author or by the transferee or licensee of the right of first publication as mentioned in sub-clause (b), and the transferee or the licensee of the right of reproduction was not a national or domiciliary of the United States or a domestic corporation or enterprise.

17 U.S.C. § 601(b) (1982).

3. Section 603(a) provides that "[t]he Secretary of Treasury and the United States Postal Service shall separately or jointly make regulations for the enforcement of the provisions of this title prohibiting importation." 17 U.S.C. § 603(a) (1982).

4. Section 603(c) provides that

[a]rticles imported in violation of the importation prohibition of this title are subject to seizure and forfeiture in the same manner as property imported in violation of the customs revenue laws. Forfeited articles shall be destroyed as directed by the Secretary of the Treasury or the court, as the case may be; however, the articles may be returned to the country of export whenever it is shown to the satisfaction of the Secretary of the Treasury that the importer had no reasonable grounds for believing that his or her acts constituted a violation of law.

17 U.S.C. § 603(c) (1982).

the Authors League and others. To obtain this result, the Authors League and Karp brought suit for a judgment declaring that section 601 and the enforcement provisions of sections 603(a) and (c) are unconstitutional and seeking an order enjoining the defendants from enforcing the manufacturing clause.

## C. The Parties

Karp is counsel to the Authors League, a national society for professional writers and playwrights. The Authors League is a not-for-profit corporation organized under the laws of the State of New York. Its purpose is to protect and advance the rights of American authors with respect to copyright and copyright protection, to preserve their first amendment rights, and to obtain adequate treatment for them under the tax laws.

The Court granted the motion of the Association of American Publishers ("AAP") to intervene as a plaintiff.[5] The AAP is a national association of about 300 American book publishers which account for between 70% and 75% of the dollar volume of all books published in the United States annually.[6]

The defendants are David L. Ladd, Register of Copyrights, who is responsible for administering provisions of the manufacturing clause, including the issuance of import statements under section 601(b)(2); James Baker, Secretary of the Treasury,[7] who is required by section 603 to enforce the import prohibitions of section 601(a); and William von Raab, Commissioner of the Customs Service, who is responsible for enforcing the import prohibitions of section

601(a) under the Secretary of Treasury's direction and pursuant to section 601(b)(2) and 603(c).

## D. The Pleadings

The Authors League and Karp filed a complaint containing three counts. In Count I, the Authors League asserts that section 601 and related provisions of section 603 are unconstitutional because these sections deprive American authors of copyright protection, discriminate among classes of authors and categories of works protected by the first amendment, and deprive United States publishers of the rights guaranteed by the first amendment. In Count II, the Authors League alleges that the manufacturing clause discriminates against American authors of literary works in English, violating their right to due process under the fifth amendment. Finally, in Count III, Karp and the Authors League allege that they caused 6,000 copies of *Fundamental Requirements of the New Copyright Act* to be manufactured in England for the purpose of importing and distributing them in the United States and that they were unable to obtain an import statement for these copies. They allege that this denial of an import statement violated their first and fifth amendment rights.

In its complaint, the AAP alleges that section 601 will prevent United States publishers who wish to do so from importing and distributing in the United States foreign-manufactured copies of literary works by United States authors in violation of

---

5. The Printing Industries of America, Inc., the Book Manufacturers' Institute, Inc., and the Graphic Communications International Union moved to intervene as defendants. The Court denied this motion "[s]ince there does not presently appear to be any reason for believing that the present defendants will not vigorously defend this action" and gave the movants permission to participate as *amicus curiae*.

6. Throughout this opinion, we will refer to Karp, the Authors League, and the AAP collectively as the plaintiffs. Where necessary, we will differentiate between them.

7. Donald T. Regan, who was serving as Secretary of the Treasury when the complaint was originally filed, was then named as a defendant. James Baker has since replaced Mr. Regan in that position. Secretary Baker is hereby ordered substituted as a party pursuant to Fed.R. Civ.P. 25(d) which provides, "[w]hen a public officer is a party to an action in his official capacity and during its pendency ... ceases to hold office, the action does not abate and his successor is automatically substituted as a party." *Id.*

**804**

their constitutional rights under the first and fifth amendments.[8]

### E. The Motions

The defendants now move to dismiss the complaint on the grounds that the plaintiffs lack standing to challenge the manufacturing clause and that they fail to raise a justiciable controversy. In the alternative, the defendants move for summary judgment, arguing that the manufacturing clause does not violate the Constitution.

The plaintiffs and the plaintiff-intervenor cross-move for summary judgment. There are no material facts in dispute.

## II. DISCUSSION

### A. Standing and Justiciability Issues

#### 1. Justiciability

The defendants argue that the Court should abstain from deciding the constitutional issue raised in this action because there is no justiciable controversy.[9] The defendants contend that Karp and the Authors League fail to raise a justiciable controversy because the plaintiffs concede that the pamphlet was published abroad solely to test the constitutionality of the manufacturing clause. In fact, the defendants point out, it was economically disadvantageous to publish the pamphlet abroad. This case, argue the defendants, is not a case or controversy within the meaning of Article III of the United States Constitution which empowers the federal courts to hear suits involving cases or controversies.

■ The plaintiffs respond that Article III does not require litigants to demonstrate a practical or compelling motive to test the manufacturing clause's constitu-

tionality and that first amendment rights cannot be restricted because those asserting them would have fared better economically if they had not exercised their rights.

■ The Court must agree with the plaintiffs. The cases cited by the defendants are inapposite. The actual question the Court must consider in determining whether this case is justiciable is whether this is a "friendly suit" or one that is "feigned or collusive in nature." *Flast v. Cohen*, 392 U.S. 83, 100, 88 S.Ct. 1942, 1952–53, 20 L.Ed.2d 947 (1968). This suit is not friendly or collusive and it is not feigned, *i.e.*, "brought on a pretended right, when the plaintiff has no true cause of action, for an illegal purpose." Black's Law Dictionary 355 (5th Ed.1979).[10]

#### 2. Standing

"A legal device crafted in decisional law to implement the case-or-controversy requirement is the doctrine of standing, which places limits on a plaintiff's ability to invoke the power of the federal courts. Standing asks whether a particular litigant is entitled to invoke the power of the federal court." *Schiavone v. United States*, 766 F.2d 70, 73 (2d Cir.1985) (citation omitted).

■ The standing requirement has both a constitutional and a prudential dimension. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). To satisfy the Constitution, the plaintiff must establish (1) that he has suffered some distinct and palpable injury; (2) that the injury was the result of the putatively illegal conduct of the defendant; and (3) that the plaintiff's injury will be redressed by a favorable court decision.

---

**8.** As of the time when they made their motion, the defendants had not been served with a copy of the plaintiff-intervenor's complaint and therefore moved to dismiss that complaint for lack of personal jurisdiction and lack of service of process. The complaint has since been served.

**9.** "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor*

*Service, Inc. v. McLaughlin*, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

**10.** Moreover, the plaintiffs have not pressed their claim as testers, but rather, as discussed below, they claim to be injured as publishers of the pamphlet. "It is in this capacity that they claim [and we consider their] standing to pursue this litigation." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 111, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

*Schiavone v. United States, supra,* 766 F.2d at 73 (citations omitted). Judge-made, prudential limitations further limit the exercise of a federal court's power by (1) requiring the plaintiff to assert his own legal rights, and not rest on the rights of a third party; (2) requiring the plaintiff's complaint to fall within the interests to be protected or regulated by the statute or constitutional guarantee in question; and (3) barring adjudication of abstract questions that are no more than generalized grievances. *Id.* (citations omitted).

When ruling on a motion to dismiss for lack of standing, the court must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party. *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. We need not decide whether the litigants will ultimately prevail in order to hold that they have standing. *Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1961).

The defendants contend that Karp and the Authors League lack standing because neither has been injured. They argue that the plaintiffs did not attempt to import the pamphlets into the United States and that the possibility that the pamphlets would be seized if the plaintiffs attempted to import them is a speculative injury insufficient to confer standing. Karp and the Authors League claim that the manufacturing clause has caused them financial injury by forbidding them from importing 6,000 copies of a pamphlet for which they expended 300 and 50/100 pounds sterling.

Because the injury-in-fact requirement exists to distinguish litigants with a direct stake in the outcome of a suit from those with a mere interest in the problem, the Supreme Court has refused to quantify a standard for demonstrating financial injury. *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416–17, n. 14, 37 L.Ed.2d 254 n. 14. "[A]n identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the mo-

tivation." *Id.* (citation omitted). Thus, Karp's and the Authors League's relatively small financial loss is sufficient to establish injury.

Impairment of rights guaranteed by the Constitution may also constitute sufficient injury to confer standing. *See Valley Forge College v. Americans United,* 454 U.S. 464, 486, 102 S.Ct. 752, 766, 70 L.Ed.2d 700 (1982) ("Standing may be predicated on non-economic injury."). Karp and the Authors League also allege injury to their constitutional rights. They claim that their first amendment rights to free speech and press are impeded because they cannot import and distribute the pamphlet which Karp wrote and which the Authors League financed, and that their fifth amendment rights to due process are violated because the manufacturing clause discriminates against American authors of literary works in English. Their standing may be predicated on this non-economic injury.

That the plaintiffs have not violated a statute and incurred its penalties does not deprive them of standing. The plaintiffs need only establish that they have taken those steps legally permitted short of the activity the statute prohibits. *See Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737–38, 13 L.Ed.2d 649 (1965); *Beckerman v. City of Tupelo,* 664 F.2d 502, 505–06 (5th Cir.1981). The fear of punishment for violation of a statute may inhibit plaintiffs in the exercise of their constitutional rights; this injury is sufficient to confer standing. *Beckerman v. City of Tupelo, supra,* 664 F.2d at 506.

Karp and the Authors League satisfy the remaining criteria for standing. All their alleged injuries arise from the challenged legislation which prohibits them from importing the copies of the pamphlet. In addition, a favorable ruling will redress their injury. If we declare the manufacturing clause unconstitutional, the plaintiffs will be permitted to import the pamphlet. Having satisfied all of the criteria for standing, Karp and the Authors League

may challenge the constitutionality of the manufacturing clause.

■ Turning to the AAP, the defendants contend that it too lacks standing. However, because both Karp and the Authors League have standing, the suit may proceed whether or not the AAP establishes an independent basis for standing. If a plaintiff establishes standing, the plaintiff-intervenor need not demonstrate an independent basis for standing to assert its representative claims. *United States Postal Service v. Brennan*, 579 F.2d 188, 190 (2d Cir.1978). Nonetheless, we find that the AAP has an independent basis for standing.

■ An organization may have standing to assert the rights of its members in a representative capacity, even if it has suffered no injury in fact. *Warth v. Seldin*, *supra*, 422 U.S. at 511, 95 S.Ct. at 2211–12. The organization must allege (1) that its members would otherwise have standing to sue in their own right; (2) that the interests it seeks to protect are germane to the organization's purpose; and (3) that neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The defendants contend that the AAP does not meet the first or second requirement. We find, however, that the AAP satisfies all three criteria for representative standing.[11]

■ First, the AAP has demonstrated that its members would otherwise be able to sue in their own right. It points to specific members who were injured financially by paying the requisite fees for import statements. It also alleges injury to constitutional rights of AAP members whom the manufacturing clause prevented from importing foreign-made copies of literary works.

Second, the interests that the AAP seeks to protect in this case are germane to the organization's purpose. The AAP aims to protect the interests of their author and publisher members in the area of copyright, and to obtain equitable treatment of those interests in copyright legislation and litigation. It has testified repeatedly on behalf of American authors and publishers in congressional and Copyright Office hearings, about the manufacturing clause.

Finally, the claim asserted and the relief requested do not require the participation of individual members in this lawsuit. Whether the manufacturing clause violates the first and fifth amendments does not depend on the identity of the plaintiff challenging the statute. Where, as here, an "association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, *supra*, 422 U.S. at 515, 95 S.Ct. at 2213–14. Thus, the AAP has standing to represent its members.

In summary, the plaintiffs raise a justiciable controversy. They, along with the AAP, have standing to bring the suit.

### B. Constitutional Issues

The plaintiffs contend that the manufacturing clause violates the first and fifth amendments. They argue that section 601 and the enforcement provisions of section 603(a) and (c) violate the first amendment by flatly prohibiting United States authors and publishers from exercising their basic first amendment right to import and distribute copies of their copyrighted literary works; by depriving United States authors and publishers of protection for their publishing rights, or of copyright, if they choose to exercise that first amendment right; and by imposing their prohibitions in an underinclusive and discriminatory manner. The plaintiffs also contend that the

---

11. The Authors League also has standing to sue in its representative capacity. The defendants do not contest this point.

same provisions violate the fifth amendment because the discrimination of section 601 lacks justification. Finally, they assert that the provisions violate the rights of United States authors and publishers to due process and equal protection.

The defendants contend that neither the "right" to import material nor the "right" to have material printed in a particular location is protected by the first amendment. Any alleged discriminatory impact, argue the defendants, is a reasonable distinction drawn by Congress. Thus, conclude the defendants, the manufacturing clause does not violate the first and fifth amendments and the Court should grant their motion for summary judgment.

The first amendment guarantees that "Congress shall make no law ... abridging the freedom of speech or of the press." U.S. Const. Amend. I. But "[n]ot every Government action that affects, has an impact on, or indeed inhibits First Amendment activity contributes the kind of 'abridgment' condemned by the First Amendment." *Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Co.*, 593 F.2d 1030, 1052 (D.C.Cir.1978), *cert. denied*, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979).

■■■■ For example, the first amendment does not preclude the government from imposing conditions on authors who seek copyright protection. The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive right to respective Writings and Discoveries." U.S. Const., art. I, § 8. Although the Constitution empowers Congress to grant patents and copyrights, it does not command Congress to do so. *Cali v. Japan Airlines, Inc.*, 380 F.Supp. 1120 (E.D.N.Y.1974), *aff'd*, 535 F.2d 1240 (2d Cir.1975). In enacting copyright legislation, Congress may attach to its grant of copyright whatever conditions and restrictions it sees fit. *United Dictionary Co. v. G & C Merriam Co.*, 208 U.S. 260, 264, 28 S.Ct. 290, 290–91, 52 L.Ed. 478 (1908).[12] Thus, a copyright holder has no rights except those bestowed on him by Congress.

■■■ There appears to be a tension between the first amendment and the copyright law. The first amendment protects one's freedom of .expression, while the copyright law grants one the exclusive right to express an idea in a particular form. In infringement cases, the courts have rejected the argument that copyright interferes with the first amendment right to freedom of expression. *See, e.g., Sid & Marty Krofft Television v. McDonalds Corp.*, 562 F.2d 1157 (9th Cir.1977); *McGraw Hill, Inc. v. Worth Publishers, Inc.*, 335 F.Supp. 415, 422 (S.D.N.Y.1971). The copyright laws, the courts reason, protect only the form of expression not its content. The former is not protected by the first amendment. *Sid & Marty Krofft Television, supra*, 562 F.2d at 1170–71. The line between an "idea" and "expression of an idea" represents "an acceptable definitional balance between copyright and free speech interests." *M.B. Schnapper v. Foley*, 471 F.Supp. 426, 428 (D.D.C.1979), *aff'd*, 667 F.2d 102 (1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982) (citing *Sid & Marty Krofft Television v. McDonalds Corp., supra*, 562 F.2d at 1170).[13]

---

**12.** No one can deny that when the legislature are about to vest an exclusive right in an author or an inventor, they have the power to prescribe the condition in which such right shall be enjoyed; and that no one can avail himself of such rights who does not substantially comply with the requirements of the law.
*Wheaton v. Peters,* 8 Pet. 591, 33 U.S. 591, 663–64, 8 L.Ed. 1055 (1834).

**13.** [T]he idea-expression line presents an acceptable definitional balance as between copyright and free speech interest. In some degree it encroaches upon freedom of speech in that it abridges the right to reproduce the 'expressions' of others, this is justified by the greater public good in the copyright encouragement of creative works. In some degree it encroaches upon the author's right to control his work in that it renders his 'ideas' per se unprotectable, but this is justified by the greater public need for free access to ideas as part of the democratic dialogue.

808

� Thus, the right to express an idea in a particular form arises from the copyright law, not from the first amendment. As discussed above, Congress has the authority to attach such conditions as it sees fit to the copyright protection it bestows. By its own language, the manufacturing clause is limited to copyrighted materials. The prohibitions of the clause, noncompliance with which can result in the diminution of protection under the copyright law,[14] are conditions that Congress saw fit to attach to its grant of protection. Such conditions on the manner of expression do not run afoul of the first amendment.

The plaintiffs' other first amendment argument[15] challenges the clause's distinction with respect to affected and unaffected materials. The plaintiffs' argument under the fifth amendment is nothing more

Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?*, 17 U.C.L.A.L.Rev. 1180, 1192–93 (1970).

14. Section 601(d) provides that
[i]mportation or public distribution of copies in violation of this section does not invalidate protection for a work under this title. However, in any civil action or criminal proceeding for infringement of the exclusive rights to reproduce and distribute copies of the work, the infringer has a complete defense with respect to all of the non-dramatic literary material comprised in the work and any other parts of the work in which the exclusive rights to reproduce and distribute copies are owned by the same person who owns such exclusive rights in the nondramatic literary material, if the infringer proves—
(1) that copies of the work have been imported into or publicly distributed in the United States in violation of this section by or with the authority of the owner of such exclusive rights; and
(2) that the infringing copies were manufactured in the United States or Canada in accordance with the provisions of subsection (c); and
(3) that the infringement was commenced before the effective date of registration for an authorized edition of the work, the copies of which have been manufactured in the United States or Canada in accordance with the provisions of subsection (c).
(e) In any action for infringement of the exclusive rights to reproduce and distribute copies of a work containing material required

than a reformation of their second first amendment argument.

Congress can create regulations and restrictions under the Copyright Act that apply to some materials, but not all, without violating the first amendment. Where, as here, a distinction is not content-based and is necessary for the accomplishment of a valid congressional purpose, it is lawful. *United Dictionary Co. v. G & C Meriam Co., supra,* 208 U.S. at 264, 28 S.Ct. at 290–91.

▇ In enacting the manufacturing clause, Congress was aiming to encourage and protect domestic printing and publishing.[16] The distinctions embodied in the manufacturing clause are carefully suited to this legitimate congressional objective and are grounded in an explicit constitutional source of legislative authority. In an earlier case dealing with a different issue, Judge Weinfeld stated the following:

by this section to be manufactured in the United States or Canada, the copyright owner shall set forth in the complaint the names of the persons or organizations who performed the processes specified by subsection (c) with respect to that material, and the places where those processes were performed.
17 U.S.C. § 601(d) (1982).
Under the Copyright Act of 1891 and the 1909 Amendment, compliance with the manufacturing requirements was clearly a condition of copyright protection. In response to the concerns of authors and publishers, section 601 no longer divests copyright protection for noncompliance. However, the exclusive right to reproduce and distribute copies are impaired by noncompliance. Moreover, in order to lawfully import copies protected under federal copyright law, the provisions of the manufacturing requirements must be followed.

15. The plaintiffs also assert a third argument under the first amendment: that the manufacturing clause works an unconstitutional condition on copyright rights of authors and publishers. This argument is derivative of the plaintiffs' first argument. Because, as shown above, Congress has the power to attach conditions to the grant of copyright protection, the conditions established by the manufacturing clause on rights under the Copyright Act are not unconstitutional.

16. Whether protectionist legislation serves the national interests is a matter for Congress, not the Courts.

[Section 601(a)] is the latest version in a series of "manufacturing clauses" that have been a part of American copyright law since 1891. From the beginning, the essential purpose of the clause has been "protectionist"—it is designed to protect the American printing industry from the competition of foreign printers. Generally, the legislation has been opposed by writers and publishers.

Section 601(a), which was the subject of considerable attention throughout deliberations on passage of the Copyright Act of 1976, substantially liberalized previous clauses. The hearings before the congressional committee at which were presented the conflicting views of interested parties, indicates that there was an awareness that no sound principle justified permanent continuance of the clause, except its "protectionist" aspect, and that even as to this element its effectiveness was questioned. In consequence, the section was passed in its present form but with an expiration date of July 1, 1982. Presently, the copyright office is studying the clause with a view to guiding Congress on whether to extend it beyond that date. Inasmuch as the clause was the subject of considerable attention by Congress and was passed in order to fulfill its economic objectives and despite the recognized objection that it is a burden on American authors, plaintiff's contention on argument of these motions that the clause should not be enforced is without merit. To accept this position would be tantamount to repeal by judicial decision.

*Stonehill Communication, Inc. v. Martuge,* 512 F.Supp. 349, 350–51 (S.D.N.Y. 1981) (footnote omitted).

The life of the manufacturing clause has now been extended to July 1, 1986, to give Congress more time to evaluate its merits. In less than one year, Congress will have the opportunity to review the clause. Despite whatever doubts we may have, we again leave it to Congress to evaluate the problem and come up with a solution.

 In summary, we find that the manufacturing clause does not violate the first or fifth amendments. It represents a rational means to protect the domestic printing and publishing industry.

## III. CONCLUSION

The Court denies the plaintiffs' motion for summary judgment and the defendants' motion to dismiss. We grant the defendants' motion for summary judgment. The Clerk will enter judgment accordingly.

SO ORDERED.