[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
05/19/99
THOMAS  K. KAHN
CLERK

————————————

No. 98-2180

————————————

D. C. Docket No. 97-53-CR-ORL-18

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALI MOGHADAM,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————

**(May 19, 1999)**

Before ANDERSON, Chief Judge, HULL, Circuit Judge, and HAND*, Senior Circuit Judge.

ANDERSON, Chief  Judge:

———————————

*Honorable William B. Hand, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

In 1994, Congress passed a statute criminalizing the unauthorized recording, the transmission to the public, and the sale or distribution of or traffic in unauthorized recordings of live musical performances. See 18 U.S.C. § 2319A. Appellant Ali Moghadam was convicted of violating that law (herein sometimes referred to as the "anti-bootlegging statute") after he pleaded guilty to knowingly distributing, selling, and trafficking in bootleg (unauthorized) compacts discs featuring live musical performances by recording artists including Tori Amos and the Beastie Boys. The present appeal challenges the constitutional power of Congress to enact this legislation.[1] In the district court, Moghadam moved to dismiss the indictment, arguing that the statute was unconstitutional because it did not fall within any of the federal legislative powers enumerated in Article I, § 8 of the Constitution. The government responded that it was constitutional under either the Copyright Clause or the Commerce Clause. The district court denied the motion to dismiss. The constitutionality of the anti-bootlegging statute appears to be a question of first impression in the nation. For the reasons that follow, and in the limited circumstances of this case, we reject Moghadam's constitutional challenge, and therefore affirm Moghadam's conviction.

---

[1] In pleading guilty, Moghdam duly preserved his right to appeal.

I.  BACKGROUND ON THE ANTI-BOOTLEGGING STATUTE

A brief overview of the history of statutory protection for music and musical performances is in order.  Musicians or performers may enjoy copyright or copyright-like protection in three things, which are important to keep distinct.  First, a musical composition itself has been protected by statute under copyright law since 1831.  See 17 U.S.C. § 102(a)(2) (providing that "musical works, including any accompanying words" are protectable subject matter); Todd D. Patterson, Comment, The Uruguay Round's Anti-Bootlegging Provision:  A Victory for Musical Artists and Recording Companies, 15 Wis. Int'l L. J. 371, 380-83 (1997).  However, for most of the nation's history, sound recordings were not protected.    See Patterson, supra, at 380 ("The important distinction between the first copyright statutes of 1831 and what would ultimately become the Sound Recording Act of 1971 is that these early statutes protected the reproduction of musical notation rather than the reproduction of actual sound.").  In 1971, Congress extended copyright protection to sound recordings.  Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391;[2] see also 17 U.S.C. § 102(a)(7) (including "sound recordings" in the list of copyrightable "works of authorship").  This meant that persons who made unauthorized reproductions of records or tapes, which is known as "piracy,"[3] could be prosecuted or face civil liability for copyright infringement.  See 17 U.S.C.

---

[2]  The entire copyright code was subsequently overhauled by the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, but the new statute carried forward the substance of the Sound Recording Act of 1971.

[3]  "Piracy," which refers to an unauthorized duplication of a performance already reduced to a sound recording and commercially released, is conceptually distinct from "bootlegging," which has been defined as the making of "an unauthorized copy of a commercially unreleased performance."  Dowling v. United States, 473 U.S. 207, 209 n.2 (1985).

§ 114 (defining the scope of exclusive rights of the holder of a copyright in sound recordings). The copyright law, especially as amended by further statutes,[4] went far toward securing the rights of musicians and recording artists to receive fair benefit from their creative efforts.

However, following passage of the Sound Recording Act of 1971, a void still remained. No protection at the federal level extended directly to unrecorded live musical performances.[5] Therefore, a bootlegger could surreptitiously record a live musical performance and engage in unauthorized distribution of the recording or copies thereof, without having violated copyright law. This gap in copyright protection, exacerbated by the growing market for such bootleg copies, motivated Congress to enact the anti-bootlegging provision at issue in the instant case.

The anti-bootlegging statute grew out of the Agreement on Trade Related Aspects of Intellectual Property ("TRIPs"), which has been described as "the highest expression to date of binding intellectual property law in the international arena." David Nimmer, The End of Copyright, 48 Vand. L. Rev. 1385, 1391-92 (1995) [hereinafter Nimmer, The End of Copyright]. TRIPs became law by operation of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465,

---

[4] See Piracy and Counterfeiting Amendments Act of 1982, Pub. L. No. 97-180, 96 Stat. 91 (codified at 18 U.S.C. §§ 2318-2319) (imposing criminal liability for trafficking in counterfeit labels attached to phonorecords); Record Rental Amendment of 1984, Pub. L. No. 98-450, 98 Stat. 1727 (codified at 17 U.S.C. §§ 109(b), 115(c)) (prohibiting rental of phonorecords to the public for commercial advantage); Audio Home Recording Act of 1992, Pub. L. No. 102-563, 106 Stat. 4237 (codified at 17 U.S.C. §§ 1001-1010) (implementing a royalty payment system and a serial copyright management system for digital audio recording); Digital Performance Rights in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 (codified at scattered sections of 17 U.S.C.) (granting public performance rights for digital transmission of sound recordings).

[5] There were and still are, however, numerous examples of statutory protection for live musical performances at the state level. See, e.g., Fla. Stat. § 540.11(2)(a)(3).

108 Stat. 4809 (1994), a comprehensive act dealing with matters of international trade. 18 U.S.C. § 2319A (which corresponds to § 513 of the URAA, 108 Stat. at 4975), provides, in pertinent part:

> (a) Whoever, without the consent of the performer or performers involved, knowingly and for purposes of commercial advantage or private financial gain—
>
> (1) fixes the sound or sounds and images of a live musical performance in a copy or phonorecord, or reproduces copies or phonorecords of such a performance from an unauthorized fixation;
>
> (2) transmits or otherwise communicates to the public the sounds or sounds and images of a live musical performance; or
>
> (3) distributes or offers to distribute, sells or offers to sell, rents or offers to rent, or traffics in any copy or phonorecord fixed as described in paragraph (1), regardless of whether the fixations occurred in the United States;
>
> shall be imprisoned . . . or fined . . . or both . . . .

The URAA also enacted a similar provision establishing civil liability for the same conduct (but omitting the commercial advantage or private financial gain requirement). See 17 U.S.C. § 1101 (corresponding to § 512 of the URAA, 108 Stat. at 4974). There is little legislative history dealing with either provision because the URAA was rushed through Congress on fast-track procedures. However, what little legislative history exists tends to suggest that Congress viewed the anti-bootlegging provisions as enacted pursuant to its Copyright Clause authority. See 140 Cong. Rec. H11441, H11457 (daily ed. Nov. 29, 1994) (statement of Rep. Hughes) ("There are a number of changes in copyright that will advance our interests in the area of bootlegging, which is going to basically protect our country.").

The rights created by the anti-bootlegging provisions in URAA are actually hybrid rights that in some ways resemble the protections of copyright law but in other ways are distinct from them. See 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8E.03[B][1], at 8E-16

5

[hereinafter Nimmer on Copyright] ("The unfixed musical performances protected under [URAA] are accorded something approximating, but not equaling, copyright protection."). For example, although the civil provision is incorporated into Title 17 of the United States Code and borrows the remedies that apply to copyright infringement, neither the civil nor the criminal provision meshes with the overall structure of the copyright code. See Patterson, supra, at 410-12. Congress could have amended 17 U.S.C. § 102 to include live musical performances in the list of protectable subject matter, but it did not do so. Likewise, it is unclear whether longstanding concepts generally applicable to copyright law such as fair use, see 17 U.S.C. § 107, the work-for-hire doctrine, limited duration, see 17 U.S.C. § 302, and the statute of limitations, 17 U.S.C. § 507(b), carry over to the anti-bootlegging provisions. See 3 Nimmer on Copyright, supra, § 8E.03[B][2][b], at 8E-13 to 23; see also Susan M. Deas, Jazzing up the Copyright Act? Resolving the Uncertainties of the United States Anti-Bootlegging Law, 20 Hastings Comm. & Ent. L.J. 567, 599-623 (1998) (providing detailed treatment of the host of interpretive problems associated with the anti-bootlegging statute); Nimmer, The End of Copyright, supra, at 1399 ("The provision of the law is so simple . . . and the language that Congress legislated so sparse, that most questions one could ask are simply not addressed in its implementation."). Finally, in contrast to the six exclusive rights of a copyright owner spelled out in 17 U.S.C. § 106, it appears that the only exclusive right created by the anti-bootlegging statute is to record and/or re-communicate one's performance.[6] For all of these reasons,

---

[6] We raise these complexities only to differentiate between this statute and pure copyright provisions. Because none of them is implicated by the instant case and Moghadam's conduct falls squarely within the anti-bootlegging statute, we need not speculate as to the appropriate resolution of these questions.

6

the protections that the anti-bootlegging statutes confer on musicians are best described as "quasi-copyright" or sui generis protections.

## II. WHETHER THE ANTI-BOOTLEGGING STATUTE CAN BE SUSTAINED UNDER THE COPYRIGHT CLAUSE OF THE CONSTITUTION

Our analysis of the constitutionality of § 2319A begins with the Copyright Clause of the United States Constitution. By that Clause, Congress is empowered "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8.[7] This positive grant of legislative authority includes several limitations. See, e.g., Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340 (1991) (holding that the word "Writings" in the Copyright Clause allows Congress to extend protection only to works of authorship that are original). Of these limitations, Moghadam has relied in the instant case only on the concept of "fixation" which is said to be embedded in the term "Writings."

The concept of fixation suggests that works are not copyrightable unless reduced to some tangible form. "If the word 'writings' is to be given any meaning whatsoever, it must, at the very least, denote some material form, capable of identification and having a more or less permanent endurance." 1 Nimmer on Copyright, supra, § 1.08[C][2], at 1-66.30 (internal quotation marks omitted); see also Goldstein v. California, 412 U.S. 546, 561 (1973) ("[W]ritings ... may be interpreted to include any physical rendering of the fruits of creative intellectual or aesthetic labor."). Of course, the term "Writings" has been interpreted so broadly as to include much more than

---

[7] The word "Discoveries" is thought to refer to the counterpart area of patent law. See 1 Nimmer on Copyright, supra, § 1.08, at 1-66.25 n.1.

writings in the literal sense, or the lay definition of the word.[8]  See 17 U.S.C. § 102(a)(4) (pantomimes and choreographic works); id. § 102(a)(6) (motion pictures and other audiovisual works); id. § 102(a)(7) (sound recordings); 1 Nimmer on Copyright, supra, § 1.08[B], at 1-66.25-26. In fact, since a sound recording qualifies as a "Writing" in the constitutional sense, Shaab v. Kleindienst, 345 F. Supp. 589, 590 (D.D.C. 1972) (per curiam), "it is now clear that a writing may be perceptible either visually or aurally," 1 Nimmer on Copyright, supra, § 1.08[B], at 1-66.27.  But the fixation requirement seems to have persisted through this expansion.  Thus, although in the modern era the term "Writings" allows Congress to extend copyright protection to a great many things, those things have always involved some fixed, tangible and durable form.  See Goldstein, 412 U.S. at 561 ("[W]ritings . . . may be interpreted to include any physical rendering of the fruits of creative intellectual or aesthetic labor."); Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1887) (defining "Writings" as "all forms of writing, printing, engraving, etching, etc., by which the ideas of the mind of the author are given visible expression").

Moghadam argues that a live performance, by definition, has not been reduced to a tangible form or fixed as of the time of the performance.  See Nimmer, The End of Copyright, supra, at 1409 ("[N]o respectable interpretation of the word 'writings' embraces an untaped performance of someone singing at Carnegie Hall."); Susan M. Deas, Jazzing up the Copyright Act? Resolving the Uncertainties of the United States Anti-Bootlegging Law, 20 Hastings Comm. & Ent. L.J. 567, 570

---

[8] Rejecting the notion that the Constitution "embalms inflexibly the habits of 1789," Judge Learned Hand wrote that the Copyright Clause's "grants of power to Congress comprise not only what was then known, but what the ingenuity of men should devise thereafter.  Of course, the new subject matter must have some relation to the grant, but we interpret by the general practice of civilized people in similar fields, for it is not a strait-jacket but a charter for a living prople." Reiss v. National Quotation Bureau, Inc., 276 F. 717, 719 (S.D.N.Y. 1921).

(1998) ("The most obvious constitutional departure found in the [anti-bootlegging law] is how [it] extends protection to unfixed material under the authority of a congressional enactment."). Moghadam argues that, but for the bootlegger's decision to record, a live performance is fleeting and evanescent.

Because we affirm the conviction in the instant case on the basis of an alternative source of Congressional power, we decline to decide in this case whether the fixation concept of Copyright Clause can be expanded so as to encompass live performances that are merely capable of being reduced to tangible form, but have not been.[9] For purposes of this case, we assume arguendo, without deciding, that the above described problems with the fixation requirement would preclude the use of the Copyright Clause as a source of Congressional power for the anti-bootlegging statute.

### III. WHETHER THE ANTI-BOOTLEGGING STATUTE CAN BE SUSTAINED UNDER THE COMMERCE CLAUSE OF THE CONSTITUTION

The government contends, however, that the anti-bootlegging statute is permissible legislation under Congress's Commerce Clause power.[10] Congress has the legislative authority "[t]o

---

[9] We note that the anti-bootlegging statute may be faced with another constitutional problem under the Copyright Clause. The Clause allows Congress to extend protection to authors only for "Limited Times." The protection afforded to live performances by § 2319A, however, contains no express time limitation and would arguably persist indefinitely. However, Moghadam has not preserved this argument, see infra, and we decline to address the argument in light of our disposition of this case.

[10] Congress's failure to cite the Commerce Clause as grounds for § 2319A does not eliminate the possibility that the Commerce Clause can sustain this legislation. "[T]he constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise," Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144 (1948), and "[i]n exercising the power of judicial review," we look only at "the actual powers of the national government," Timmer v. Michigan Dept. of Commerce, 104 F.3d 833, 839 (6th Cir. 1997) (emphasis added).

9

regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause empowers Congress to legislate regarding three things: (i) the use of channels of interstate commerce; (ii) instrumentalities and persons or things in interstate commerce; and (iii) intrastate activities that substantially affect interstate commerce. United States v. Lopez, 115 S. Ct. 1624, 1629-30 (1995). Our analysis here focuses on the third category of appropriate legislation. The applicable test is "whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." Id. at 1629. To survive Commerce Clause scrutiny, § 2319A " 'must bear more than a generic relationship several steps removed from interstate commerce, and it must be a relationship that is apparent, not creatively inferred.' " United States v. Wright, 117 F.3d 1265, 1270 (11th Cir. 1997) (quoting United States v. Kenney, 91 F.3d 884, 888 (7th Cir. 1996)), vacated in part on other grounds, 133 F.3d 1412 (11th Cir.), cert. denied, 119 S. Ct. 217 (1998).

Because Congress thought it was acting under the Copyright Clause, predictably there are no legislative findings in the record regarding the effect of bootlegging of live musical performances on interstate or foreign commerce. Such findings are normally helpful to a court in finding an interstate commerce nexus. See Cheffer v. Reno, 55 F.3d 1517, 1520 (11th Cir. 1995) (upholding statute regarding freedom of access to abortion clinics under the Commerce Clause and relying on a plethora of specific legislative findings in the record regarding the effect of violence and physical obstruction on commerce in reproductive health services); see also United States v. Viscome, 144 F.3d 1365, 1371 (11th Cir.) (holding that "explicit findings that the proscribed activity in issue substantially affected interstate commerce" are accorded "substantial deference"), cert. denied, 119

10

S. Ct. 362 (1998). However, the lack of such findings does not rule out the Commerce Clause as a possible source of legislative authority applicable to the statute under challenge. Wright, 117 F.3d at 1269. In Lopez, the Court said that although "congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye," Lopez, 115 S. Ct. at 1632, "Congress normally is not required to make [such] formal findings," id. at 1631.

Section 2319A also contains no jurisdictional element as is commonly found in criminal statutes passed under authority of the Commerce Clause. That is, there is no requirement that, for example, the bootleg copies or phonorecords have traveled in interstate or foreign commerce. Just as legislative findings can help fortify a statute against Commerce Clause scrutiny, a jurisdictional element is helpful because it ensures that each individual case will necessarily satisfy the required interstate commerce nexus. Lopez, 514 U.S. at 1631 (noting that express jurisdictional elements "limit [a statute's] reach to a discrete set of [offenses] that additionally have an explicit connection with or effect on interstate commerce"). However, the absence of such a jurisdictional element connecting the offense to interstate or foreign commerce does not necessarily mean the Commerce Clause cannot serve as authority. Wright, 117 F.3d at 1269; see also Viscome, 144 F.3d at 1371 & n.12 (noting that even though Congress had recently amended statute criminalizing possession of machineguns to include jurisdictional element, that did not necessarily mean previous version of statute without jurisdictional element exceeded Commerce Clause authority); United States v. Olin Corp., 107 F.3d 1506, 1510 (11th Cir. 1997) ("[A]lthough Congress did not include in CERCLA either legislative findings or a jurisdictional element, the statute remains valid as applied in this case because it regulates a class of activities that substantially affects interstate commerce."). The

11

absence of such a jurisdictional element simply means that "courts must determine independently whether the statute regulates 'activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affect[] interstate commerce.' " Olin Corp., 107 F.3d at 1509 (quoting Lopez, 115 S. Ct. at 1631).

Section 2319A clearly prohibits conduct that has a substantial effect on both commerce between the several states and commerce with foreign nations. The link between bootleg compact discs and interstate commerce and commerce with foreign nations is self-evident. For example, one of the elements of the offense is that the activity must have been done "for purposes of commercial advantage or private financial gain." 18 U.S.C. § 2319A(a). If bootlegging is done for financial gain, it necessarily is intertwined with commerce. Bootleggers depress the legitimate markets because demand is satisfied through unauthorized channels. Cf. Wickard v. Filburn, 317 U.S. 111, 127-28 (1942) (finding an interstate commerce nexus sufficient to support federally mandated wheat growing limits in the fact that farmers who grew wheat for home consumption would not buy wheat in the normal market, thereby depressing commerce). Generally speaking, performing artists who attract bootleggers are those who are sufficiently popular that their appeal crosses state or national lines. The very reason Congress prohibited this conduct is because of the deleterious economic effect on the recording industry.[11] The specific context in which § 2319A was enacted involved a

---

[11] The government's brief in the instant case traced the impact that bootlegging of live performances has on commerce:

> The trafficking in bootleg sound recordings results in unjust enrichment of persons who unfairly appropriate the intellectual property and potential profits of sound recording companies and artists. The regulated activity thus substantially affects the profitability and viability of the aggregate sound recording industry. In other words, trafficking in bootleg sound recordings substantially affects and threatens the continuous interstate commercial activity generated by the artists

12

treaty with foreign nations, called for by the World Trade Organization, whose purpose was to ensure uniform recognition and treatment of intellectual property in international commerce. The context reveals that the focus of Congress was on interstate and international commerce.

Moreover, the type of conduct that Congress intended to regulate by passing the anti-bootlegging statute is by its very nature economic activity, which distinguishes the statute from the Gun-Free School Zones Act struck down in <u>Lopez</u>, which in criminalizing the possession of handguns within 1000 feet of a school, "ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." <u>Lopez</u>, 115 U.S. at 1630-31. <u>See also</u> Nimmer, <u>The End of Copyright</u>, <u>supra</u>, at 1410 n.155 ("Although [<u>Lopez</u>] demonstrates that Congress's power under the Commerce Clause is not infinite, it does not remotely threaten the viability of this trade law, given how close to the core of economic activity the Uruguay Round Agreements lie."). We hold that the anti-bootlegging statute has a sufficient connection to interstate and foreign commerce to meet the <u>Lopez</u> test.

The more difficult question in this case is whether Congress can use its Commerce Clause power to avoid the limitations that might prevent it from passing the same legislation under the Copyright Clause. As noted above, we assume <u>arguendo</u> that the Copyright Clause could not sustain this legislation because live performances, being unfixed, are not encompassed by the term "Writings" which includes a fixation requirement. The government argues that the anti-bootlegging conviction in this case can be sustained under the Commerce Clause. We turn now to this issue.

---

and sound recording companies, which incur significant risks in the nationwide marketing of the fixed sounds of live musical performances.

Government's Initial Brief at 15.

13

In general, the various grants of legislative authority contained in the Constitution stand alone and must be independently analyzed. In other words, each of the powers of Congress is alternative to all of the other powers, and what cannot be done under one of them may very well be doable under another. Perhaps the most prominent example of this principle is Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964). There, the Supreme Court considered the constitutionality of the public accommodation provisions of the Civil Rights Act of 1964. The earlier Civil Rights Cases, 109 U.S. 3 (1883), had declared unconstitutional similar provisions of the Civil Rights Act of 1875 because they regulated private conduct beyond the scope of the legislative authority granted by § 5 of the Fourteenth Amendment. Yet, the Heart of Atlanta Motel Court held, the Civil Rights Act of 1964 was predicated on the Commerce Clause and possessed sufficient connection to interstate commerce. See Heart of Atlanta Motel, 379 U.S. at 250. The Court's reasoning illustrates that, as a general matter, the fact that legislation reaches beyond the limits of one grant of legislative power has no bearing on whether it can be sustained under another. Id. (concluding that Congress possessed ample power pursuant to the Commerce Clause, and "we have therefore not considered the other grounds relied upon. This is not to say that the remaining authority upon which it acted was not adequate, a question upon which we do not pass, but merely that since the commerce power is sufficient for our decision here we have considered it alone"); see also South Dakota v. Dole, 483 U.S. 203, 207 (1987) (holding that pursuant to the Spending Clause, U.S. Const. art. I, § 8, cl. 1, Congress may condition its appropriation of money to the states on their agreement to impose restrictions that would be beyond Congress's constitutional legislative authority to enact directly).

14

This general approach has been applied in a context involving the Copyright Clause and the Commerce Clause as alternative sources of Congressional power. The Trade-Mark Cases, 100 U.S. 82 (1879), involved an 1876 Congressional enactment of a primitive sort of trademark protection ("1876 Act"), long before the modern-day Lanham Act. Act of Aug. 14, 1876, 19 Stat. 141. This statute conferred protection on, and prohibited the counterfeiting of, various types of trademarks. The defendants were criminally prosecuted under the 1876 Act for trying to pass off imitation beverage products as brand-name by imitating famous trademarks of well-known beverage makers. The defendants challenged the constitutionality of the 1876 Act, arguing that Congress did not have legislative authority to enact it. As in the instant case, the government responded by proffering the Copyright Clause and Commerce Clause as alternative possible bases of legislative authority.

Apparently, just as was the case with the anti-bootlegging statute, Congress labored under the impression that it was acting pursuant to its Copyright Clause power. The Trade-Mark Cases, 100 U.S. at 93 ("[U]ntil a critical examination of the subject in the courts became necessary, it was mainly if not wholly to [the Copyright C]lause that the advocates of the law looked for its support."). Nevertheless, the Supreme Court held that the Copyright Clause could not sustain the 1876 Act because "[t]he ordinary trade-mark has no necessary relation to invention or discovery," which were the hallmarks of protectable subject matter under the Copyright Clause. The Trade-Mark Cases, 100 U.S. at 94. Trademarks are inherently commercial; the concept behind the 1876 Act (and modern trademark law) was not to encourage intellectual and artistic development, but rather to protect businesses from predatory behavior in the marketplace. See id. ("[A trademark] requires no fancy or imagination, no genius, no laborious thought. It is simply founded on priority of appropriation."). These characteristics made trademarks substantively different from the material the Congress was

15

constitutionally able to protect pursuant to the Copyright Clause. A trademark could be registered under the 1876 Act even without any showing of originality. "While such legislation may be judicious aid . . . and may be within the competency of legislatures whose general powers embrace that class of subjects," the Court held, "we are unable to see any such power in the constitutional provision concerning authors and inventors, and their writings and discoveries." Id.

The Court next considered whether Congress could enact the 1876 Act under the Commerce Clause. The Court summarized the government's argument at the outset as that "the trade-mark is . . . a useful and valuable aid or instrument of commerce, and its regulation by virtue of the [Commerce C]lause belongs to Congress." Id. at 95. The Court appeared receptive to this argument. However, it must be remembered that the Trade-Mark Cases predated the New Deal-era expansion of the Commerce Clause. In the nineteenth century, "there still remain[ed] a very large amount of commerce, perhaps the largest, which, being trade or traffic between citizens of the same State, [was] beyond the control of Congress." Id. at 96. Unfortunately (but understandably, since Congress had labored under the impression that it was authorized to enact the 1876 Act under its Copyright Clause power), there was no jurisdictional-type element in the 1876 Act to ensure that trademark protection would extend only insofar as related to interstate commerce. See id. at 97 ("Here is no requirement that [a person receiving trademark protection] shall be engaged in the kind of commerce which Congress is authorized to regulate."). Consequently, the Court ultimately struck down the 1876 Act as not sustainable under either the Copyright Clause or the Commerce Clause.

Although the 1876 Act did not survive due to the restrictive view of the Commerce Clause prevailing at that time, the Supreme Court's analysis in the Trade-Mark Cases stands for the proposition that legislation which would not be permitted under the Copyright Clause could

16

nonetheless be permitted under the Commerce Clause, provided that the independent requirements of the latter are met. Of course, we have already held that the anti-bootlegging statute satisfies the "substantial effects" test of post-<u>Lopez</u> Commerce Clause jurisprudence. The analysis in the <u>Trade-Mark Cases</u> tends to refute the argument that Congress is automatically forbidden from extending protection under some other grant of legislative authority to works that may not be constitutionally protectable under the Copyright Clause. Indeed, modern trademark law is built entirely on the Commerce Clause, <u>see, e.g.</u>, <u>Jellibeans, Inc. v. Skating Clubs of Ga., Inc.</u>, 716 F.2d 833, 838 (11th Cir. 1983), and we have found no case which suggests that trademark law's conferral of protection on unoriginal works somehow runs afoul of the Copyright Clause. <u>See</u> Michael B. Gerdes, Comment, <u>Getting Beyond Constitutionally Mandated Originality as a Prerequisite for Federal Copyright Protection</u>, 24 Ariz. St. L.J. 1461, 1471 (1992) ("The constitutionality of current federal trademark legislation . . . supports the conclusion that the Copyright Clause does not limit Congress's Commerce Clause power to grant copyright-like protection.").

A similar analysis was adopted by the Second Circuit in <u>Authors League of America, Inc. v. Oman</u>, 790 F.2d 220 (2d Cir. 1986). There, the issue was the constitutionality of 17 U.S.C. § 601, a now-expired provision designed to protect the domestic book publishing and printing industries by restricting the importation of copyrighted, nondramatic literary works which were published abroad. The plaintiffs argued, <u>inter alia</u>, that this statute went beyond Congress's legislative power under the Copyright Clause because of the introductory language in the Clause which restricts such legislation to that which helps to "promote the progress of . . . useful arts." Section 601, the plaintiffs argued, was essentially protectionist economic legislation that did not serve that purpose. The Second Circuit responded to this argument as follows:

17

> What plaintiffs' argument fails to acknowledge, however, is that the copyright clause is not the only constitutional source of congressional power that could justify [§ 601]. In our view, denial of copyright protection to certain foreign-manufactured works is clearly justified as an exercise of the legislature's power to regulate commerce with foreign nations.

790 F.2d at 224. The Authors League analysis suggests that the Commerce Clause may be used to accomplish that which the Copyright Clause may not allow.

On the other hand, it might be argued that some of the grants of legislative authority in Article I, § 8 contain significant limitations that can be said to represent the Framers' judgment that Congress should be affirmatively prohibited from passing certain types of legislation, no matter under which provision. The Supreme Court touched on such a situation in Railway Labor Executives' Ass'n v. Gibbons, 455 U.S. 457 (1982). Congress had enacted a statute that purported to alter a pending bankruptcy case by requiring the debtor railroad company's bankruptcy estate to pay $75 million to the company's former employees. This statute directly clashed with the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4, which provides that Congress is empowered to pass "uniform" bankruptcy laws, because the law targeted a particular situation and was anything but uniform. The Court quickly brushed off the possibility that the legislation could nevertheless be sustained under the Commerce Clause (which contains no uniformity requirement), stating that "if we were to hold that Congress had the power to enact nonuniform bankruptcy laws pursuant to the Commerce Clause, we would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws." Id. at 468-69. In Railway Labor Executives, the statute that Congress passed directly conflicted with the uniformity requirement of the Bankruptcy Clause. Cf. Paul J. Heald, The Vices of Originality, 1991 Sup. Ct. Rev. 143, 168-75 (arguing that Congress would not be able to circumvent the originality requirement inherent in the term "Writings" in the Copyright

18

Clause by passing a statute under the Commerce Clause which extended copyright-like protection to unoriginal works).

We note that there is some tension between the former line of cases (Heart of Atlanta, the Trade-Mark Cases and Authors League) and the Railway Labor Executives case. The former cases suggest that in some circumstances the Commerce Clause can be used by Congress to accomplish something that the Copyright Clause might not allow. But the Railway Labor Executives case suggests that in some circumstances the Commerce Clause cannot be used to eradicate a limitation placed upon Congressional power in another grant of power. For purposes of the instant case, we resolve this tension in the following manner. In resolving this tension and in reaching our conclusion in this case, we undertake a circumscribed analysis, deciding only what is necessary to decide this case, and we reach a narrow conclusion. First, as described above, we hold the anti-bootlegging statute satisfies the "substantial effects" test of the post-Lopez Commerce Clause jurisprudence. Second, following the former line of cases (Heart of Atlanta, the Trade-Mark Cases and Authors League), we hold that in some circumstances the Commerce Clause indeed may be used to accomplish that which may not have been permissible under the Copyright Clause. We hold that the instant case is one such circumstance in which the Commerce Clause may be thus used. It is at this point that we must resolve the tension with Railway Labor Executives.

Resolving this tension, we take as a given that there are some circumstances, as illustrated by Railway Labor Executives, in which the Commerce Clause cannot be used by Congress to eradicate a limitation placed upon Congress in another grant of power.[12] For the reasons that follow,

---

[12]     We assume arguendo, without deciding, that the Commerce Clause could not be used to avoid a limitation in the Copyright Clause if the particular use of the Commerce Clause (e.g., the anti-bootlegging statute) were fundamentally inconsistent with the particular limitation

19

we hold that the instant case is not one such circumstance. We hold that the Copyright Clause does not envision that Congress is positively forbidden from extending copyright-like protection under other constitutional clauses, such as the Commerce Clause, to works of authorship that may not meet the fixation requirement inherent in the term "Writings." The grant itself is stated in positive terms, and does not imply any negative pregnant that suggests that the term "Writings" operates as a ceiling on Congress' ability to legislate pursuant to other grants. Extending quasi-copyright protection to unfixed live musical performances is in no way inconsistent with the Copyright Clause, even if that Clause itself does not directly authorize such protection. Quite the contrary, extending such protection actually complements and is in harmony with the existing scheme that Congress has set up under the Copyright Clause.[13] A live musical performance clearly satisfies the originality requirement. Extending quasi-copyright protection also furthers the purpose of the Copyright Clause to promote the progress of the useful arts by securing some exclusive rights to the creative author. Finally, with respect to the fixation requirement, upon which this opinion focuses, although a live musical performance may not have been fixed, or reduced to tangible form, as of the time the bootleg copy was made, it certainly was subject to having been thus fixed. Our conclusion that extending copyright-like protection in the instant case is not fundamentally inconsistent with the fixation requirement of the Copyright Clause is bolstered by an example from the prior copyright law. If a live performance is broadcast, e.g., by radio or television, and simultaneously recorded by the performer, any unauthorized recording by a person receiving the broadcast constitutes copyright

---

in the Copyright Clause (e.g., the fixation requirement).

[13]     In light of our disposition of this case, we need not address the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, as a possible source of Congressional power.

20

infringement of the sound recording or motion picture, notwithstanding that the infringer actually copied the live performance directly, and not the fixation thereof. This result is based upon the last sentence of the definition of "fixed" in 17 U.S.C. § 101. That last sentence provides: "A work consisting of sounds, images, or both, that are being transmitted, is 'fixed' for purposes of this title if a fixation of the work is being made simultaneously with its transmission." This definition creates a legal fiction that the simultaneous fixation occurs before the transmission and the unauthorized recording. See H.R. Rep. 94-1476, at 52-53, reprinted in 1976 U.S.C.C.A.N. 5659, 5665-66; 1 Nimmer on Copyright, supra, § 1.08[C][2], at 1-66.32 ("It is as if one who was dictating live into a tape recorder were overheard and copied at the moment of dictation. At that moment, the material has become a 'writing,' even if copied simultaneously, rather than a moment later."). While we are aware that the constitutionality of this aspect of the statute has never been tested, the ease with which it has been incorporated into the prior copyright law suggests that fixation, as a constitutional concept, is something less than a rigid, inflexible barrier to Congressional power. Indeed, if a performer under the prior law could effectively protect a live musical performance, circumventing the fixation requirement, simply by the device of simultaneous recordation, the anti-bootlegging law seems to us like more of an incremental change than a constitutional breakthrough. Common sense does not indicate that extending copyright-like protection to a live performance is fundamentally inconsistent with the Copyright Clause.

For the foregoing reasons, we conclude that extending copyright-like protection in the instant case is not fundamentally inconsistent with the fixation requirement of the Copyright Clause. By

21

contrast, the nonuniform bankruptcy statute at issue in <u>Railway Labor Executives</u> was irreconcilably inconsistent with the uniformity requirement of the Bankruptcy Clause of the Constitution.[14]

We note that there is another limitation in the Copyright Clause that may be implicated by the anti-bootlegging statute: the "Limited Times" requirement that forbids Congress from conferring intellectual property rights of perpetual duration. <u>See</u> <u>Pennock v. Dialogue</u>, 27 U.S. 1, 16-17, 7 L. Ed. 327, 333 (1827). On its face, the protection created by the anti-bootlegging statute is apparently perpetual and contains no express time limit; therefore phonorecords of live musical performances would presumably never fall into the public domain. <u>See</u> Nimmer, <u>The End of Copyright</u>, <u>supra</u>, at 1411 ("[T]he Caruso example of protecting a work from a century ago and for centuries into the future . . . is the antithesis of 'limited times.' "); <u>see also</u> <u>Goldstein v. California</u>, 412 U.S. 546, 560-61 (1973) (suggesting that a copyright of unlimited duration would have a tendency to inhibit the progress of the arts). However, because Moghadam has not challenged the constitutionality of § 2319A on this basis,[15] we decline to raise the issue <u>sua sponte</u>. Thus, we do not decide in this case whether extending copyright-like protection under the anti-bootlegging statute might be

_____

[14] Our holding is limited to the fixation requirement, and should not be taken as authority that the other various limitations in the Copyright Clause can be avoided by reference to the Commerce Clause. <u>Compare</u> Nimmer, <u>The End of Copyright</u>, <u>supra</u>, at 1413 (decrying that Congress may "jettison <u>Feist</u>" by analogy to the URAA because "[w]hy is a telephone book any further afield than a performance at Carnegie Hall?"), <u>with</u> Gerdes, <u>supra</u>, at 1461 (proposing that Congress legislatively overrule <u>Feist</u> and extend copyright protection to unoriginal works by relying on the Commerce Clause).

[15] Moghadam did not make this argument in the district court or in his brief on appeal. He fleetingly mentions the "Limited Times" requirement for the first time in his reply brief on appeal, and even then does not argue that extending copyright-like protection in this case pursuant to the Commerce Clause would be prohibited by an inconsistency with the "Limited Times" requirement of the Copyright Clause. The government has not had any opportunity to present a defense to such an argument, and it would be unfair to entertain the argument at this late date.

22

fundamentally inconsistent with the "Limited Times" requirement of the Copyright Clause, and we do not decide in this case whether the Commerce Clause can provide the source of Congressional power to sustain the application of the anti-bootlegging statute in some other case in which such an argument is preserved. We reserve those issues for another day.

Summarizing our narrow holding in this case, we assume <u>arguendo</u>, without deciding, that the anti-bootlegging statute cannot satisfy the fixation requirement of the Copyright Clause; we hold that the statute satisfies the "substantial effects" test of the post-<u>Lopez</u> Commerce Clause jurisprudence; we hold that the Commerce Clause can provide the source of Congressional power in this case because the extension of copyright-like protection here is not fundamentally inconsistent with the fixation requirement of the Copyright Clause;[16] and thus under the circumstances of this case,[17] we reject Moghadam's constitutional challenge to his conviction.

## IV. CONCLUSION

For the foregoing reasons,[18] the judgment of the district court is

---

[16]     Because we find no such inconsistency, we need not decide the consequences if there were inconsistency. <u>See</u> note 12, <u>supra</u>.

[17]     As noted above, Moghadam has waived any constitutional challenge based on the "Limited Times" requirement of the Copyright Clause, and thus our holding in this case is further narrowed by the fact that we do not address potential arguments based on the "Limited Times" requirement.

[18]     We reject Moghadam's other arguments on appeal without need for discussion.

23

AFFIRMED.