790 F.2d 220
 7 ITRD 2313, 54 USLW 2603, 229 U.S.P.Q. 724,
1986 Copr.L.Dec. P 25,933, 12 Media L. Rep. 2145
 THE AUTHORS LEAGUE OF AMERICA, INC., and Irwin Karp,
Plaintiffs-Appellants,
The Association of American Publishers, Plaintiff-Intervenor-Appellant.
v.
Ralph OMAN, Register of Copyrights; James A. Baker, III,
Secretary of the Treasury; and William Von Raab,
Commissioner, United States Customs
Service, Defendants-Appellees.
 No. 850, Docket 85-6346.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 19, 1986.
Decided May 6, 1986.
 
 Irwin Karp, Portchester, N.Y., for plaintiffs-appellants.
 Paskus, Gordon & Mandel, New York City, for plaintiff-intervenor-appellant.
 Frederick Lawrence, Asst. U.S. Atty., S.D.N.Y. (Rudolph W. Giuliani, U.S. Atty., Steven E. Obus, Asst. U.S. Atty., of Counsel), for defendants-appellees.
 Brown, Wood, Ivey, Mitchell & Petty, New York City and Loomis, Owen, Fellman & Howe, Washington, D.C., for Book Manufacturers' Institute, Inc., Printing Industries of American, Inc., and Graphic Communications Intern. Union, amicus curiae.
 Before OAKES, WINTER, and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 The sole issue raised on this appeal is the constitutionality of the manufacturing clause of the Copyright Act, 17 U.S.C. Sec. 601 (1985), a provision that restricts importation of copyrighted, foreign-manufactured, nondramatic, literary works. Plaintiffs argue that the clause interferes with their first and fifth amendment rights and that the clause cannot be justified as an exercise of power under the copyright clause of the constitution. Because we agree with the court below that the manufacturing clause does not interfere with first amendment rights to distribute and circulate ideas and that the clause is permissible economic legislation aimed at protecting the American printing industry, we affirm.
 
 BACKGROUND
 
 2
 I. The Manufacturing Clause.
 
 
 3
 The manufacturing clause has, in one form or another, been a part of American copyright law for almost 100 years. Stonehill Communications, Inc. v. Martuge, 512 F.Supp. 349, 351 (S.D.N.Y.1981). Although the works and authors to which the clause applies have varied over the years, its purpose has always been the same: to protect domestic labor and manufacturers in the printing and publishing industry. This legislation seeks to encourage the use of American printers by denying full copyright protection to works imported in violation of the clause.
 
 
 4
 The version of the clause currently in effect and at issue here was enacted as part of the 1976 Copyright Act and states in pertinent part:
 
 
 5
 The importation into or public distribution in the United States of copies of a work consisting predominantly of [nondramatic] literary material that is in the English language and is protected under this title is prohibited unless the portions consisting of such material have been manufactured in the United States or Canada.
 
 
 6
 17 U.S.C. Sec. 601(a) (1985). Congress has not only limited application of the clause to works authored by American citicitizens or domiciliaries, see id. Sec. 601(b)(1), but has also provided several additional enumerated exemptions from the limit on importation. For example, any person may import a single copy of any work for personal use at any time, id. Sec. 601(b)(4)(A); copies imported for the libraries of "scholarly, educational, or religious" organizations and not for private gain are similarly exempt, id. Sec. 601(b)(4)(C); and up to 2,000 copies of a single work manufactured in violation of the clause may be freely imported, id. Sec. 601(b)(6).
 
 
 7
 Under the applicable regulations authorized by 17 U.S.C. Sec. 603(a), an unlimited number of copies of a work manufactured in violation of the clause may be imported if, when applying for an import statement, the importer shows that a statement of abandonment of copyright has been filed and recorded in the copyright office and the notice of copyright is completely obliterated from the works sought to be imported. 19 C.F.R. Sec. 133.51(b)(3) (1985). In effect, therefore, foreign manufacture does not bar importation or distribution of any work for which copyright protection is not claimed.
 
 
 8
 The 1976 version of the clause was set to expire by its own terms in 1982; however, congress voted to extend its life until July 1, 1986. See 17 U.S.C. Sec. 601 (1985). Although the President vetoed that bill, congress overrode the veto in July 1982. Bills are presently pending in both houses that would make the manufacturing clause permanent, H.R. 3465, 99th Cong., 1st Sess.; S. 1822, 99th Cong., 1st Sess.
 
 
 9
 II. The Facts and The Proceedings Below.
 
 
 10
 Plaintiffs are The Authors League of America ("Authors League") and Irwin Karp. Authors League is a national society of professional writers and playwrights. Karp is counsel to Authors League and the author of a copyrighted pamphlet entitled Fundamental Requirements of the New Copyright Act. Together they have structured this case specifically to challenge the manufacturing clause. In the summer of 1982 they had 6,000 copies of Karp's pamphlet published in England. On August 16, 1982, Karp requested the issuance of import statements to him and to Authors League, each to cover 3,000 copies of Karp's pamphlet. Since the pamphlets were manufactured in violation of the manufacturing clause and Karp did not present evidence of abandonment of copyright, Customs refused to issue the requested statement.
 
 
 11
 Shortly thereafter, on August 30, 1982, plaintiffs brought this action. The district court granted a motion by The Association of American Publishers to intervene as plaintiffs and granted permission to The Printing Industries of America, Inc., the Book Manufacturers' Institute, Inc., and the Graphic Communications International Union to participate as amicus curiae. Plaintiffs sought a declaration that the manufacturing clause is unconstitutional and an injunction preventing defendants from enforcing the clause so that a lawful importation of the Karp pamphlets could take place.
 
 
 12
 On December 6, 1983, defendants moved to dismiss the complaint on the grounds that the plaintiffs lacked standing and that they failed to raise a justiciable controversy. Both sides cross-moved for summary judgment on the constitutional questions. After finding in favor of plaintiffs on the preliminary questions of standing and justiciability, the district court granted the government's motion for summary judgment. See Authors League of America, Inc. v. Ladd, 619 F.Supp. 798 (S.D.N.Y.1985). This appeal followed.
 
 DISCUSSION
 
 13
 No appeal has been taken from the district court's decision as to the standing and justiciability questions; we therefore limit our review to the question of the constitutionality of the manufacturing clause. Initially we address the first amendment challenge.
 
 
 14
 According to plaintiffs the limitation that the manufacturing clause places on importation of foreign-manufactured literary works unconstitutionally interferes with an author's first amendment right to distribute and circulate ideas as well as the public's right to receive those ideas. Although defendants concede the existence of the first amendment rights to which plaintiffs allude, they argue that since free importation is allowed to any author who agrees to forego United States' copyright protection, the clause places no burden on the exercise of those rights. We agree.
 
 
 15
 Since existing regulations allow for the importation and distribution of an unlimited number of foreign-manufactured literary works if the author agrees to forego copyright protection, the impact of the manufacturing clause is not, as plaintiffs argue, on the right to freely distribute and receive literary works, but only on the right to freely distribute and receive works that enjoy full copyright protection. Seeking to fashion a right extending beyond any existing precedent, plaintiffs rely on a variety of cases that refer generally to the constitutionally protected right of an author to distribute his ideas and of the public to receive those ideas. A brief review of these cases reveals, however, that the rights granted by the first amendment are not as broad as plaintiffs claim.
 
 
 16
 While plaintiffs have seized upon specific judicial language that, abstractly considered, tends to support their position, they have failed to consider the substance and context of the precedents on which they rely. For example, plaintiffs rely on Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), where the Court stated that legislation that "inhibit[s] the circulation of publications" is the proper subject of injunctive relief, id. at 67, 83 S.Ct. at 638, and on Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), where the Court held unconstitutional an ordinance that imposed "a severe limitation on the public's access to constitutionally protected matter", id. at 153, 80 S.Ct. at 218. Plaintiffs also cite to Lamont v. Postmaster General, 381 U.S. 301, 306, 85 S.Ct. 1493, 1496, 14 L.Ed.2d 398 (1965) where the Court criticized attempts by the government to "control the flow of ideas to the public". Although an extension of the cited portions of Bantam, Smith, and Lamont might suggest that any limitation at all on importation would interfere with the free flow of information and would therefore be unconstitutional, a closer reading of these cases reveals that the specific rights with which they dealt are unaffected by, and unrelated to, the manufacturing clause and the economic problems it was designed to alleviate.
 
 
 17
 Both Bantam and Smith involved attempts to control the flow of obscene material to the public. The Bantam ordinance was struck down because it established a nonjudicial panel to screen all books to determine whether they contained "obscene, indecent or impure" language, thereby establishing an unconstitutional system of prior restraint. See Bantam, 372 U.S. at 70-71, 83 S.Ct. at 639-640. The Smith ordinance was held unconstitutional because it made mere possession of obscene material by a bookseller a criminal act and impermissibly dispensed with any mens rea requirement. See Smith, 361 U.S. at 153-54, 80 S.Ct. at 218-19.
 
 
 18
 Similarly, the statute held unconstitutional in Lamont required a government official to screen literature from abroad to determine whether it constituted "communist political propaganda". Lamont, 381 U.S. at 302, 85 S.Ct. at 1494. Although the content-based screening of the Lamont statute did not bar the entry of such literature or, as in Bantam or Smith, restrict its sale or possession, it did require that before the post office could forward the mail the intended recipient must return a card requesting that the mail be delivered. This "official act" required after the screening of the mail would, in the Court's view, have a deterrent effect on the exercise of the addressee's first amendment right to receive ideas and therefore constituted an unconstitutional abridgment of that right. See id. at 305-06, 85 S.Ct. at 1495-96. No similar infirmity afflicts the manufacturing clause.
 
 
 19
 Even the case most heavily relied on by plaintiffs, Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), cannot be read as broadly as plaintiffs urge. There, the Supreme Court struck down an ordinance that gave a municipal official the right to pass upon applications to distribute literature in the form of circulars or handbooks. Although the ordinance made no particular reference to the content of the literature, it gave the government official the right to bar completely the distribution of particular forms of literature.
 
 
 20
 In striking down the ordinance in Lovell, the Court quoted from Ex parte Jackson, 6 Otto 727, 733, 96 U.S. 727, 733, 24 L.Ed. 877 (1877), the principle that "[l]iberty of circulating is as essential to [the right of freedom of speech] as liberty of publishing; indeed, without the circulation, the publication would be of little value". Lovell, 303 U.S. at 452, 58 S.Ct. at 669. Read as broadly as possible, Lovell arguably could stand for the proposition that government may not exercise its power to ban completely a particular form of distribution. Yet even assuming such a broad interpretation, the manufacturing clause would not offend this principle and thereby run afoul of the first amendment. This is because, under the regulation, if the author is willing to forego copyright protection, there is no restriction on free distribution of a foreign-manufactured work.
 
 
 21
 Put simply, the cases plaintiffs rely upon establish that there is a constitutional right to freely circulate one's ideas. They also establish the public's right to receive those ideas. They do not, however, create any right to distribute and receive material that bears protection of the Copyright Act. Given the absence of precedent granting any such right and of any judicially cognizable reason or policy to establish such a right, we conclude that plaintiffs have not demonstrated any first amendment infirmity in the manufacturing clause.
 
 
 22
 Having concluded that the manufacturing clause does not implicate any right protected by the first amendment, we have no difficulty in concluding that the clause does not, as plaintiffs argue, draw any impermissible distinctions in violation of the equal protection component of the fifth amendment. To pass muster under the fifth amendment, the distinctions drawn in the clause need only be "rationally related to legitimate legislative objectives." Cleland v. National College of Business, 435 U.S. 213, 220-21, 98 S.Ct. 1024, 1028-29, 55 L.Ed.2d 225 (1978) (per curiam); see Dandridge v. Williams, 397 U.S. 471, 484-86, 90 S.Ct. 1153, 1161-62, 25 L.Ed.2d 491 (1970). On this issue we agree with the district court that the version of the clause ultimately adopted by congress was based on a careful and reasoned decision aimed at the legitimate goal of encouraging the use and growth of the domestic printing industry. See Authors League, 619 F.Supp. at 808; accord Stonehill, 512 F.Supp. at 350-51.
 
 
 23
 Finally, we turn to the contention that the manufacturing clause does not represent a valid exercise of congressional power in any event. Citing to Graham v. John Deere Co., 383 U.S. 1, 5, 86 S.Ct. 684, 687, 15 L.Ed.2d 545 (1966), plaintiffs argue that the exercise of congressional power under the copyright clause may be justified only if the legislation at issue promotes the progress of the useful arts. According to plaintiffs, the manufacturing clause is not a valid exercise of congressional power because protection of the domestic printing industry is only tenuously related to the goal sought to be furthered by the granting of a copyright.
 
 
 24
 What plaintiffs' argument fails to acknowledge, however, is that the copyright clause is not the only constitutional source of congressional power that could justify the manufacturing clause. In our view, denial of copyright protection to certain foreign-manufactured works is clearly justified as an exercise of the legislature's power to regulate commerce with foreign nations. See U.S. Const. art. 1, Sec. 8, cl. 3. It has long been established that the power to regulate commerce includes the power to partially or wholly exclude from importation any subject within the sphere of commerce when that measure is necessary to serve the interests of the nation. See L. Tribe, American Constitutional Law 223 n. 6 (1978) (citing United States v. Marigold, 9 How. 560, 566-67, 50 U.S. 560, 566-67, 13 L.Ed. 257 (1850); Weber v. Freed, 239 U.S. 325, 329-30, 36 S.Ct. 131, 131-32, 60 L.Ed. 308 (1915); see also The Abby Dodge, 223 U.S. 166, 176-77, 32 S.Ct. 310, 312-13, 55 L.Ed. 390 (1912). We have no doubt that this plenary authority includes the power to regulate commercial distribution of literary works printed outside the country for the purpose of fostering the growth of an American industry. As noted above, there was extensive debate in both the house and senate over the benefits of retaining the manufacturing clause and ultimately, it was agreed that the clause served the proper purpose of protecting the domestic publishing industry. It is not for the courts to second-guess that legislative decision.
 
 CONCLUSION
 
 25
 The manufacturing clause of the copyright act is valid protectionist legislation that does not interfere with constitutional rights aimed at protecting the free flow of ideas. Accordingly, the judgment of the district court granting the government's motion for summary judgment and refusing to enjoin enforcement of the clause is affirmed.
 
 OAKES, Circuit Judge (concurring):
 
 26
 I do not view the case as so clear as the majority opinion views it. Rather, like the late Melville B. Nimmer, I believe judicial review of the manufacturing clause requires a balancing between the interests in authorship under the copyright clause and in freedom to disseminate one's views under the First Amendment on the one hand and the protectionist interest in aiding our country's book manufacturers and printing unions on the other hand. See 2 M. Nimmer, Nimmer on Copyright Sec. 7.22[C], at 7-161 n. 51 (1985); see also Notes of the Committee on the Judiciary, H.Rep. No. 94-1476, reprinted as 17 U.S.C. Sec. 601 note (1982). At the same time, I recognize that Congress may in the exercise of its commerce power frame customs duties with a view to protecting and encouraging domestic industries, especially since it has done so since the second act it adopted, Act of July 4, 1789, ch. 2, 1 Stat. 24, cited in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 411, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928). Given the clear legitimacy of such enactments, I can see no reason why there should be a per se rule that Congress cannot in the exercise of its commerce powers condition copyright protection on American manufacture in order to advance the same protectionist interest, at least when, as in this case, the condition applies only to dissemination in the United States of the works of United States domiciliaries and there is no demonstrably significant burden on the exercise of First Amendment rights.
 
 
 27
 Professor Nimmer viewed the manufacturing clause as a prior restraint, Nimmer on Copyright Sec. 7.22[C], at 7-161 n. 51, with its attendant heavy burdens. See New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). But under certain circumstances, as Professor Paul Freund has reminded us, generalizations about prior restraints and repugnance "must yield to more particularistic analysis." Freund, The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 539 (1951); see Oakes, The Doctrine of Prior Restraint Since the Pentagon Papers, 15 U.Mich.J.L.Ref. 497 (1982). Here, the extent of restraining, of the impact of the clause so to speak, may properly be taken into constitutional account. The restraint that the clause imposes on nondramatic literary works is one of finding a North American publisher/printer and bearing the cost of publication/printing in this country or Canada. There is no restraint whatsoever on 2,000 copies of the author's work. 17 U.S.C. Sec. 601(b)(2) (1982). Even as to other copies, while violation of the clause gives copyright infringers a complete defense, it does not invalidate copyright protection. 17 U.S.C. Sec. 601(d) (1982). Moreover, the restraint applies only to "copies of a work consisting preponderantly of nondramatic literary material that is in the English language," 17 U.S.C. Sec. 601(a) (1982), and even then a number of exceptions are made, e.g., where importation is sought for use by any government body or by the library of an organization operated for scholarly, educational, or religious purposes. 17 U.S.C. Secs. 601(b)(3), 601(b)(4)(C) (1982). Thus, books consisting of dramatic material, see 17 U.S.C. Sec. 601(a), and those composed preponderantly of pictorial, graphic, or other nonliterary material are free of restraint, Stonehill Communications, Inc. v. Martuge, 512 F.Supp. 349, 351 (S.D.N.Y.1981). In light of these exceptions, which permit, within limits, the dissemination of material printed abroad, the extent of the facial restraint that the manufacturing clause produces is not constitutionally unacceptable.
 
 
 28
 This is not to say that I would necessarily hold the manufacturing clause valid as to all authors or if its exceptions were in any way narrowed. On the facts of this case there is no showing that the plaintiffs could not have their copyrighted pamphlet, "Fundamental Requirements of the Copyright Act," printed in this country for a sum no greater than the cost of printing in England, where it was in fact printed for 300 & 50/100 pounds sterling. In short, there has been no showing that the burden imposed on plaintiffs is significant. But there may be circumstances in which a heavy burden can be shown. The Notes to the House Committee on the Judiciary Report above mentioned, for example, refer to "small editions and scholarly works, some of which could not be published otherwise," i.e., if the clause were not eliminated. 17 U.S.C. Sec. 601 note at 102 (1982). In other words, given a sufficient showing of actual prior restraint, the statute as applied may well in my opinion be unconstitutional. But no such showing has been made in this "test" case. Thus, I would hold that the statute is not unconstitutional on its face and leave to another day the question whether it is unconstitutional as applied to a given author--a day which with expiration of the statute will, hopefully, never come. Thus, I concur in the judgment of affirmance.