**KISS CATALOG, et. al., Plaintiffs,**

v.

**PASSPORT INT'L PRODS.,
et. al., Defendants.**

**No. CV 03–8514 WJR(CWX).**

United States District Court,
C.D. California.

Dec. 21, 2004.

See also 108 Fed.Appx. 525.

Barry E. Mallen, Manatt Phelps & Phillips, Joy T. Teitel, Manatt Phelps & Phillips, Los Angeles, CA, for Plaintiffs.

Michael R. Blaha, Michael R. Blaha Law Offices, Santa Monica, CA, for Defendant.

W Gary Kurtz, W Gary Kurtz Law Offices, Westlake Village, for Third Party Defendant.

## OPINION AND ORDER DENYING, IN PART, AND GRANTING, IN PART, DEFENDANTS' MOTION TO DISMISS

REA, District Judge.

The matter came on for hearing before the Court, the Honorable William J. Rea, Judge, presiding, on November 22, 2004. Having considered the motion, the papers filed in support thereof and in opposition thereto, the oral argument of counsel, and the file in the case, the Court now makes the following decision: the Court DENIES, in part, and GRANTS, in part, Defendants' Motion to Dismiss. Specifically, the Court holds that Plaintiffs have adequately pled a claim of copyright infringement but that their anti-bootlegging claim should be dismissed because it is unconstitutional.

### BACKGROUND

Plaintiffs KISS Catalog, Ltd., Gene Klein (a.k.a. Gene Simmons), and Paul Stanley have brought anti-bootlegging, copyright, trademark, and related state law claims against Defendants Passport International Productions, Inc. and Passport International Productions of California (collectively "Passport").

Plaintiff KISS Catalog, Ltd. is the owner of trademarks relating to the band KISS. KISS is an iconic rock band that has been performing and producing music since the 1970s. Both Klein and Stanley

are recording artists, songwriters, and founding members of the band KISS. Passport is a California corporation and at least part of Passport's business involves the distribution of DVDs.

Plaintiffs have pled the following relevant facts in their Third Amended Complaint ("TAC"). On July 10, 1976, KISS performed at New Jersey's Roosevelt Stadium as part of its "Spirit of '76" concert tour. TAC at ¶ 19. John Scher, the President and CEO of Metropolitan Talent, Inc. ("Metropolitan"), was the concert promoter for the Roosevelt Stadium performance. *Id.* at ¶ 20. As part of its services, Metropolitan filmed the Roosevelt Concert so that it could simultaneously project KISS' performance on-screen behind the band while it was onstage. *Id.* Metropolitan then apparently held on to its recording of the concert for the next thirty years.

Plaintiffs have alleged that, on or about June 2003, Historic Films Archive LLC ("Historic"), acting as an agent for Metropolitan, entered into a "Stock Footage License Agreement" with Passport regarding the use of the long-forgotten Roosevelt Concert footage. *Id.* at ¶ 21. Passport contends that the "Stock Footage License Agreement" allowed it to distribute the Roosevelt Concert film footage to the public. Passport packaged the Roosevelt Concert footage, in DVD format, as "KISS: The Lost Concert" and began selling the product in October 2003. *Id.* at ¶ 22.

In November 2003, Plaintiffs first filed suit against Defendants' on a variety of trademark and state law claims. Soon thereafter, in December 2003, this Court issued a preliminary injunction against Defendants' sale of the disputed footage. That preliminary injunction order was appealed and subsequently reversed by the Ninth Circuit.

In August 2004, Plaintiffs amended their Complaint to add an anti-bootlegging claim under 17 U.S.C. § 1101(a)(3). More recently, in October 2004, Plaintiffs amended their Complaint a second time in order to add a claim of copyright infringement. Plaintiffs added their copyright infringement claim after obtaining a declaration from Scher stating that the Roosevelt Concert footage was a work-for-hire and KISS was the rightful copyright owner.

After the Ninth Circuit's reversal, Plaintiffs again moved the Court for a preliminary injunction to enjoin the distribution of the Lost Concert DVD. On November 8, 2004, the Court granted Plaintiffs' Motion for a Preliminary Injunction on the basis of their recently-added copyright infringement claim.

Prior to court's decision on Plaintiffs' Motion for a Preliminary Injunction, Defendants' filed the instant Motion to Dismiss Plaintiffs' claims of copyright infringement and anti-bootlegging.

## DISCUSSION

### I. Legal standards

Pursuant to Rule 12(b)(6), a party may bring a motion to dismiss a plaintiff's claims on the ground that the allegations "fail to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Generally, "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Thus, dismissal is proper because of either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988).

In reviewing a Rule 12(b)(6) motion, the court must construe all allega-

tions in the complaint in the light most favorable to the plaintiff and accept as true all material allegations in the complaint. *Hosp. Bldg. Co. v. Trs. of the Rex Hosp.,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The court may consider any material that is properly submitted as part of the complaint, including exhibits, as part of the pleadings to be reviewed. *See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 430 (9th Cir.1978).

■ Finally, a court should grant leave to amend even if the plaintiff does not request it, unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995).

### A. Copyright infringement

■ "Copyright claims need not be pled with particularity." *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 167 F.Supp.2d 1114, 1120 (C.D.Cal.2001). "[S]imply alleging present ownership by plaintiff, registration in compliance with the applicable statute and infringement by defendant" is sufficient to state a claim for copyright infringement. *See id.*

### B. Anti-bootlegging, 17 U.S.C. § 1101

Title 17, Section 1101 of the U.S.Code broadly prohibits unauthorized fixation and trafficking in sound recordings and music videos:

(a) Unauthorized acts. Anyone who, without the consent of the performer and performers involved—

(1) fixes the sound or sounds and images of a live musical performance in a copy or phonorecord . . .

(2) transmits or otherwise communicates to the public the sounds or

sounds and images of a live musical performance, or . . .

(3) distributes or offers to distribute, sells or offers to sell . . . any copy or phonorecord fixed as described in paragraph (1) . . .

shall be subject to the remedies provided in sections 502 through 505, to the same extent as an infringer of copyright. 17 U.S.C. § 1101.

## II. Application to the Instant Case

### A. Copyright infringement

Defendants offer two arguments as to why Plaintiffs' copyright infringement claim should be dismissed: (1) Plaintiffs should be estopped from pleading this claim because it allegedly conflicts with exhibits attached to the Third Amended Complaint, *see* Defendants' Motion at 5–7; and (2) Plaintiffs should be estopped from pleading this claim because it is factually inconsistent with their anti-bootlegging claim, *see id.* at 7–8.

As to their first argument, Defendants cite *Helfand v. Gerson,* 105 F.3d 530 (9th Cir.1997), and *Trans–World International v. Smith–Hemion Productions,* 972 F.Supp. 1275 (C.D.Cal.1997), for the proposition that "Plaintiffs must be estopped from alleging these factually inconsistent positions before this Court." *See* Defendants' Motion at 7. On the basis of letters submitted with Plaintiffs' TAC, Defendants argue that Plaintiffs cannot now claim that they own the copyright to the disputed footage. *See id.* at 5–7. Both of the cases cited by Defendants discuss the doctrine of judicial estoppel:

Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. It is an equitable doctrine intended to

protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts.

*Helfand,* 105 F.3d at 534 (citations and quotations omitted). The Court holds that this equitable doctrine does not apply in the instant case since Plaintiffs are not arguing inconsistent positions. Plaintiffs have submitted exhibits in their TAC indicating that Metropolitan and its agent, Historic, may have misrepresented (or, at least, failed to be forthcoming) about what Defendants had obtained through the Stock Footage License Agreement. Even though Plaintiffs have only recently produced the Scher Declaration and amended their complaint to include a copyright infringement claim, KISS has never said that it, as opposed to Metropolitan or Historic, granted Defendants the copyright to the Roosevelt Concert. Thus, their current claim that Defendants are infringing their copyright does not present an inconsistency worthy of imposing judicial estoppel.

■ As to their second argument, Defendants cite *Stutz Motor Car of America, Inc. v. Reebok International,* 909 F.Supp. 1353, 1360 (C.D.Cal.1995), for the proposition that: "Plaintiffs must be barred from taking these inconsistent factual positions." *See* Defendants' Motion at 7. This portion of *Stutz* also discusses the doctrine of judicial estoppel. In this apparent version of judicial estoppel, Defendants argue that Plaintiffs cannot simultaneously claim that Metropolitan's taping was a work-for-hire and that the footage was a bootleg video prohibited by 17 U.S.C. § 1101. *See id.*

However, under the Federal Rules of Civil Procedure, a litigant can properly plead inconsistent claims:

> Under Rule 8(e)(2) a party is permitted to set forth inconsistent statements either alternatively or hypothetically within a single count or defense, or in separate claims or defenses. He also may state as many separate claims or defenses as he has, regardless of consistency . . . .

Wright & Miller, Federal Practice and Procedure: Civil 2d § 1283 (West 1990). Further, "[u]nder Federal Rule 8(e)(2) a party may include inconsistent allegations in a pleading's statement of facts." *Id. See also Ryan v. Foster & Marshall, Inc.,* 556 F.2d 460, 463 (9th Cir.1977) ("Under Fed. R.Civ.P. 8(e)(2) a pleader can assert alternative claims even if the claims are inconsistent."). Thus, Plaintiffs' claims of copyright infringement and anti-bootlegging may both be pled despite this apparent inconsistency.

■ In response, Plaintiffs simply argue that they have sufficiently pled a copyright infringement claim. Plaintiffs have alleged that they own the copyright to the Roosevelt Concert footage. TAC at ¶ 80. They claim ownership through a work-for-hire arrangement with John Scher, the promoter for the Roosevelt Concert. TAC at ¶ 81, Ex. 3. Plaintiffs have registered their copyright to the concert footage with the U.S. Copyright Office. TAC at ¶ 80, Ex. 2. They have also duly alleged that Defendants infringed their copyright. TAC at ¶ 82. The Court holds that Plaintiffs' copyright infringement claim should not be dismissed since they have pled ownership of the copyright via the work-for-hire arrangement, registration of the copyright, and infringement by Defendants. *See Perfect 10,* 167 F.Supp.2d at 1120.

### B. Anti-bootlegging, 17 U.S.C. § 1101(a)(3)

Section 1101 was a provision of the Uruguay Round Agreements Act that brought the United States into the World Trade Organization (WTO). "The enactment of the anti-bootlegging statute grew out of the Uruguay Round of trade negotiations

under the General Agreements on Tariffs and Trade ("GATT")." *United States v. Martignon,* 346 F.Supp.2d 413, 418 (S.D.N.Y.2004). "In April 1994, 111 nations signed the Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations, and in so doing adopted the Agreement on Trade–Related Aspects of Intellectual Property Rights ('TRIPs')." *Id.* "In the United States, TRIPs became law with Congressional approval of the Uruguay Round Agreements Act ('URAA')" on December 8, 1994. *Id.* Before 1994, there was no federal anti-bootlegging protection for live performances. *Id.* at 416. However, anti-bootlegging laws previously existed at the state level. *Id.*

Despite the existence of the anti-bootlegging law for ten years, this Court has been unable to find any reported cases addressing this statute. Thus, many of the issues discussed below are matters of first impression.

In the instant motion, Defendants present three arguments as to why Plaintiffs' anti-bootlegging claim should be dismissed.

### 1. Inconsistency with copyright infringement claim

Defendants' first argument is that Plaintiffs' anti-bootlegging claim cannot succeed because the Roosevelt concert was recorded with the consent of KISS via the work-for-hire agreement with Metropolitan. *See* Defendants' Motion at 2–3. However, Plaintiffs have pled that "[t]he Roosevelt Concert was fixed in a copy or phonorecord without the consent of Plaintiffs Klein and Stanley." TAC at ¶ 75. Further, Plaintiffs have also pled that Defendants

attempted to distribute copies of the Roosevelt Concert without their consent. TAC at ¶ 76. Thus, Plaintiffs have stated a claim under § 1101(a)(3).

Again, Defendants seem to be arguing that there is an impermissible inconsistency between Plaintiff's copyright infringement and anti-bootlegging claims. This argument is the mirror-image of Defendants' second argument to dismiss Plaintiffs' copyright infringement claim. As already discussed, Rule 8(e)(2) permits inconsistent pleading. For this reason, Defendants' argument is unavailing here as well.

### 2. Time of fixation vs. time of distribution

■ Defendants' second argument is that § 1101(a)(3) does not apply to their distribution of the concert footage since the unauthorized recording allegedly occurred before the time period covered by the statute. *See* Defendants' Motion at 3–4. Section 1101(c) states that the statute "shall apply to any act or acts that occur on or after the date of the enactment of the Uruguay Round Agreements Act" in 1994. In response, Plaintiffs argue that while the fixation of the concert performance took place prior to 1994, Defendants are *now* attempting to distribute copies of KISS' performance—thus making Defendants' present behavior actionable. *See* Opposition at 7–8. Plaintiffs believe, relying on Nimmer on Copyright, that the broad language of § 1101 does in fact prohibit distribution of a pre–1994 bootleg.[1] *See* Opposition at 8; Nimmer on Copyright § 8E.03[C][2] (Matthew Bender 2004).

■ It is possible that Congress could have intended to limit the scope of

---

**1.** Defendants argue further that Nimmer's opinion is wrong because it is based on faulty readings of the TRIPs Agreement and the Berne Convention for the Protection of Literary and Artistic Works. *See* Defendants' Motion at 4 n. 2. But, in fact, Nimmer's opinion is based largely on a reading of the plain text of the statute.

§ 1101(a)(3) to instances where the live performance being protected took place after 1994. However, the plain text of the statute does not support that reading. Statutory interpretation "begins with the language of the statute." *Leocal v. Ashcroft,* —— U.S. ——, ——, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004). Further, "[w]hen interpreting a statute we must give words their 'ordinary or natural' meaning." *Id.* No language in § 1101(a)(3) restricts the distribution prohibition to bootleg recordings made after 1994.

Defendants seem to argue that § 1101(a)(3) incorporates § 1101(a)(1) in that the distribution of an unauthorized recording is not prohibited unless that bootleg was made post–1994. However, the plain language of the statute prohibits distribution of a bootleg recording as an offense distinct from the initial recording. In fact, it seems that one could violate both § 1101(a)(1) and § 1101(a)(3) by first making a bootlegging recording and then attempting to distribute or sell that bootleg. Since these are distinct provisions, the temporal restriction of § 1101(a)(1) would have no impact on § 1101(a)(3).

Perhaps one could seize on the "fixed as described in paragraph (1)" portion of § 1101(a)(3) as integrating § 1101(a)(1)'s temporal restriction. However, nothing in § 1101(a)(1) actually restricts the time in which a violation has occurred. The "applicability" of § 1101 is contained in § 1101(c). Thus, the reference to § 1101(a)(1) only indicates that § 1101(a)(3) prohibits distribution of bootleg recordings.

Therefore, the Court holds that the plain language of § 1101(a)(3) does not limit its scope to post–1994 live performances.

There is no legislative history on this aspect of § 1101(a)(3) to rebut the plain language of the statute. Actually, there is little legislative history on § 1101 besides various statements that Congress intended to prohibit bootlegged recordings of live performances. *See* H.R.Rep. No. 103–826, pt. 1, at 8 (1994); S.Rep. No. 103–412, at 225 (1994); H.R. Rep. 103–316 (1994) (incorporating Statement of Administrative Action, "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements"). As the statute was part of significant and wide-ranging trade legislation, the anti-bootlegging provisions were understandably not a focus of the debates.[2]

Given the absence of any language limiting the prohibition on distribution of bootleg recordings to those fixed after 1994, the Court holds that Plaintiffs' § 1101(a)(3) claim does not fail even though the Roosevelt Concert was filmed in 1976.

### 3. Constitutionality of § 1101

Lastly, Defendants have argued that § 1101(a)(3) is unconstitutional. *See* De-

---

**2.** To the extent that Congress enacted § 1101 in order to comply with the TRIPs agreement, the Court notes that Article 14 of that agreement specified that anti-bootlegging protection "shall last at least until the end of a period of 50 years computed from the end of the calendar year in which the fixation was made or the performance took place." Trade–Related Aspects of Intellectual Property Rights (TRIPs), art. 14(5), http://www.wto.org/english/docs_e/legal_e/27–trips_01_e.htm. To the Court's knowledge, the TRIPs agreement only establishes a floor, rather than a ceiling, for the protection of intellectual property. Thus, Congress could have intended to establish a term of protection even longer than 50 years. In any case, 1976 is well within the minimum 50–year period established by TRIPs. *See generally* Susan M. Deas, Jazzing up the Copyright Act? Resolving the Uncertainties of the United States Anti–Bootlegging Law, 20 Hastings Comm. & Ent. L.J. 567, 587–94 (1998) (discussing TRIPs and the URAA).

fendants' Motion at 4–5. For this proposition, Defendants cites two cases, *Martignon* and *United States v. Moghadam*, 175 F.3d 1269 (11th Cir.1999), that addressed 18 U.S.C. § 2319A, a criminal statute that prohibits bootlegging. While there are slight differences between the statutes, § 1101 and 18 U.S.C. § 2319A are sister provisions implicating similar questions of constitutionality. Besides the difference in penalties, the only substantive differences are that § 2319A also requires that the infringer "knowingly" made an unauthorized recording and did so "for purposes of commercial advantage or private financial gain." Both § 1101 and § 2319A were provisions of the Uruguay Round Agreements Act. *See* Pub.L. No. 103–465, 108 Stat. 4809 (1994).

In the *Martignon* opinion, Judge Baer presents a thorough analysis of whether 18 U.S.C. § 2319A is constitutional. That Court held that § 2319A was unconstitutional after making the following points:

(1) Congress' enactment of § 2319A was made under the express authority provided by the Copyright Clause of the Constitution, *see* U.S. Const., Art. I, § 8, cl. 8;

(2) Section 2319A was not a proper exercise of Congress' power under the Copyright Clause because the statute violates both the clause's fixation and durational limits; and

(3) Congress may not resort to its legislative powers under the Commerce Clause to enact § 2319A because the provisions of the statute are in direct conflict with the express limitations of the Copyright Clause.

*See Martignon*, at 418.

In *Moghadam*, the Eleventh Circuit held that § 2319A, addressing slightly different arguments, was constitutional. As

Defendants move to dismiss Plaintiffs' § 1101(a)(3) claim on the basis on *Martignon*, this Court will focus on that district court opinion but will refer to *Moghadam* insofar as it is relevant.

### a. Whether § 1101 is copyright-like legislation

The *Martignon* court first examined whether § 2319A was either "a copyright law or a commercial regulation." *Id.* at 419. This step is "essential to determine how to classify a statute in order to ensure that it does not run afoul of any express limitations imposed on Congress when regulating in that respective arena." *Id.* In the court's opinion, it was "pretty clear that when Congress enacted the anti-bootlegging statute, it believed that it was acting pursuant to its Copyright Clause powers." *Id.See also Moghadam*, 175 F.3d at 1275 (stating that "Congress thought it was acting under the Copyright Clause"); *but see* Nimmer on Copyright § 8E.05[A] ("In the context of Chapter 11 [of Title 17], the question arises how Congress viewed its enactment authority. There is no answer. Chapter 11 itself offers no clue as to how it might pass constitutional muster. The legislative history, Statement of Administrative Action, and floor statements are similarly bereft of support.").

After further analysis, the *Martignon* court, based on the statute's "language, history, and placement," held that § 2319A was copyright-like regulation passed pursuant to Congress' Copyright Clause power. *Id.* at 422–23. This Court does not believe there can be much debate that § 1101 is a copyright-related statute. Unlike the criminal prohibitions contained in § 2319A, section 1101 is attached to the rest of the U.S.Code's copyright provisions and seeks to offer copyright-like protections for recordings of live performances.[3]

---

**3.** Section 1101 offers "the remedies provided    in sections 502 through 505, to the same

### b. Whether § 1101 is constitutional as legislation passed under the Copyright Clause

The Copyright Clause is both a grant of power and a limitation. *See Eldred v. Ashcroft,* 537 U.S. 186, 212, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (citing *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). The Copyright Clause contains two limitations with respect to copyright; the Copyright Clause protects "writings" only "for limited Times." *See* U.S. Const., Art. I, § 8, cl. 8 ("To promote the Progress of Science and useful Arts, by securing for limited Times, to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."). The *Martignon* court held that § 2319A was unconstitutional because the statute violated both limitations. *See id.* at 422–23.

■ As to both the fixation and limited duration requirements, this Court bears in mind that "the elementary rule is that every reasonable construction must be resorted to, in order to *save a statute* from unconstitutionality." *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (quotations and citations omitted) (emphases in original). However, this principle "is qualified by the proposition that 'avoidance of a difficulty will not be pressed to the point of disingenuous evasion.'" *Id.* at 191, 111 S.Ct. 1759 (quoting *George Moore Ice Cream Co. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933)).

#### i. "Writings": fixation requirement

The Copyright Clause protects a wide variety of expression far beyond the everyday understanding of "writing." Copyright protection exists for literary works, musical works, dramatic works, choreography, pictures, sculptures, motion pictures, sound recordings, architectural drawings, among other expressive works. *See Martignon,* at 422–23 n. 12 (citing 17 U.S.C. § 102(a)). The term "Writing" should not be construed in the "narrow literal sense" but with the "reach necessary to reflect the broad scope of constitutional principles." *Goldstein v. California,* 412 U.S. 546, 561, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973).

However, as broad as the term has become, the Copyright Clause still limits what can be protected by copyright. "Thus, although in the modern era the term 'Writings' allows Congress to extend copyright protection to a great many things, those things always involved some fixed, tangible and durable form." *Moghadam,* 175 F.3d at 1274. *See also* Nimmer on Copyright § 1.08[C][2] ("If the word 'writings' is to be given any meaning whatsoever, it must, at the very least, denote some material form, capable of identification and having a more or less permanent endurance.").

At first glance, it would seem that a live performance protected by § 1101 is not a fixed work. A live performance is intangible and does not endure. If "writings" continues to exist as a constitutional limit, live performances cannot be within the scope of that term. Thus, one would be inclined to think that, as the *Martignon* court held, live performances could not be regulated via the Copyright Clause.[4] "While the category of 'writings' has expanded over time, it has never moved into the realm of unfixed works." *Martignon,*

___

extent as an infringer of copyright."

4. In *Moghadam,* 175 F.3d at 1274, the Eleventh Circuit did not rule on the question of whether protection of live performances would violate the fixation requirement.

at 424. *See also* David Nimmer, The End of Copyright, 48 Vand. L.Rev. 1385, 1409 (1995) (stating that "no respectable interpretation of the word 'Writings' embraces an untaped performance of someone singing in Carnegie Hall").

However, Plaintiffs have brought a claim under § 1101(a)(3) which prohibits the unauthorized distribution of an unauthorized recording of a live performance. *See* Opposition at 7–8. Since the allegedly unauthorized recording has already been made, that existing recording may satisfy the fixation requirement. *See Goldstein*, 412 U.S. at 561, 93 S.Ct. 2303 (stating that "Writings" may include "any physical rendering of the fruits of creative intellectual or aesthetic labor"); *Moghadam*, 175 F.3d at 1280 (observing that unlike a live performance, a bootleg copy is fixed). Like the *Moghadam* court, *see* 175 F.3d at 1274, this Court will not attempt to reach a conclusion on this question. As the further discussion will indicate, the Court finds other unconstitutional defects with § 1101.[5] But, the Court does believe that this is a closer question with respect to § 1101(a)(3) than it would be under § 1101(a)(1) or § 1101(a)(2).

Thus, the Court turns to the limited duration requirement of the Copyright Clause.

### ii. "for limited Times": duration requirement

▇▇ Like "writings," the "for limited Times" restriction has not presented a serious obstacle to the expansion of copyright protection. In *Eldred*, 537 U.S. at 199, 123 S.Ct. 769, the Supreme Court held, "At the time of the Framing, [limited] meant what it means today: 'confine[d] within certain bounds,' 'restrain[ed]' or 'circumscribe[d].' " (citing eighteenth-century dictionaries). In *Eldred*, the Court held that the Copyright Term Extension Act, which increased the term of existing copyrights by twenty years, did not violate the "limited Times" duration requirement. *Id.* at 199–208, 123 S.Ct. 769. The Court so held, in part, because Congress "has regularly applied duration extensions to both existing and future copyrights." *Id.* at 200–01, 123 S.Ct. 769. Perhaps, the only way in which Congress could violate the "limited Times" requirement would be to enact "perpetual copyrights." *See id.* at 208–10, 123 S.Ct. 769.

Section 1101 does not contain any time limit for its protections. *See Moghadam*, 175 F.3d at 1281 (suggesting that "the protection created by the anti-bootlegging statute is apparently perpetual and contains no express time limit"). For this reason, the *Martignon* court held that § 1101 also violates the Copyright Clause due to the lack of a limited duration.[6] *See Martignon*, at 424. However, the *Martignon* court did not attempt, as Plaintiffs suggest, *see* Opposition at 8, to interpret the anti-bootlegging provisions as incorporating the terms for copyright contained in 17 U.S.C. § 302.

Initially, the Court is skeptical of this approach. The Court notes that § 1101 refers to 17 U.S.C. §§ 502–05 for remedies but does not incorporate § 302 which establishes the duration of copyrights. From this, it is reasonable to conclude that Congress included as much existing copyright law as it intended. While the Court

---

5. As the Court believes that it should reluctantly declare legislation to be unconstitutional, it is not necessary to find two constitutional defects where only one is necessary to adjudicate the instant Motion to Dismiss.

6. Because the petitioner failed to preserve this issue on appeal, the *Moghadam* court, *see* 175 F.3d at 1274 n. 9, did not rule on whether § 2319A violated the Copyright Clause's limited duration requirement.

will attempt to "save" the anti-bootlegging statute through "reasonable construction", incorporating § 302 into § 1101 is much closer to legislating an amendment to the United States Code than this Court is willing to venture.

Further, *Eldred* suggests that the courts do not have the proper expertise to divine what is an appropriate term for copyrights and copyright-like protections like the anti-bootlegging statutes. The Copyright Clause is a "constitutional command" directing Congress to design a system that promotes the "Progress of Science and useful Arts." *Eldred,* 537 U.S. at 212, 123 S.Ct. 769. In *Eldred,* the Court "stressed ... that it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." *Id.* "As the text of the Constitution makes plain, it is *Congress* that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (emphasis added). This legislative task "involves a difficult balance between the interests of authors and inventors in the control and exploitation of their writings and discoveries on one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Id.* Given the difficulty of this task, the Court is unwilling to insert the statutory term of protection provided by § 302 without some indication that Congress had contemplated doing so at some point during its deliberation.

In addition, modern intellectual property law has international implications that makes this task even more difficult. Section 1101 "grew out of the Agreement on Trade Related Aspects of Intellectual Property ("TRIPs"), which has been described as 'the highest expression to date of binding intellectual property law in the international arena.'" *Moghadam,* 175 F.3d at 1272 (quoting The End of Copyright, 48 Vand. L.Rev. at 1391–92). The TRIPs agreement itself incorporates several other international treaties regarding intellectual property:

> For instance, all WTO members must follow the Berne Convention in the sphere of copyright (except for its moral rights provision), the Paris Convention in the patent sphere, the Washington Treaty on Intellectual Property in Respect of Integrated Circuits, and the Rome Convention for performances and neighboring rights.

The End of Copyright, 48 Vand. L.Rev. at 1392.

Given the designation of Congress as the branch of government to protect copyright and the international complexities of that project, this Court holds that it cannot simply read in the term for copyrights that exists in other portions of Title 17. Since the Court cannot include a limited term of its own accord, the Court holds that the current version of the statute creates perpetual copyright-like protection in violation of the "for limited Times" restriction of the Copyright Clause.

Since the Court holds that § 1101 violates an express limit of the Copyright Clause, the next inquiry is whether Congress could use one of its other enumerated powers to enact that statute.

### c. Whether there is an alternative basis for § 1101: Commerce Clause

Whether Congress can use other sources of legislative power, such as the Commerce Clause, to enact a statute that may not be passed under the Copyright Clause is a question with no clear answer. As an initial matter, this Court believes that § 1101 is legislation that

could be passed under the Commerce Clause; that copyright-like protection for live performances touches on commerce is a proposition that should be without serious dispute.[7] Thus, the more difficult constitutional question confronts the Court—could Congress use the alternative means of the Commerce Clause to achieve the same end?

On this question, the *Martignon* court held that:

> In order to give meaning to the express limitations provided in the Copyright Clause, when enacting copyright-like legislation, such as the anti-bootlegging statute ... Congress may not, if the Copyright Clause does not allow for such legislation, enact the law under a separate grant of power, even when that separate grant provides authority.

*Martignon*, at 424–25.

In contrast, the *Moghadam* court followed a more moderate position. The *Mo-*

*ghadam* court held that "in some circumstances the Commerce Clause indeed may be used to accomplish that which may not have been permissible under the Copyright Clause." 175 F.3d at 1280. In holding that § 2319A was constitutional, the Eleventh Circuit concluded that enactment of the statute pursuant to the Commerce Clause was not "fundamentally inconsistent with the fixation requirement of the Copyright Clause."[8]

Both the *Martignon* and *Moghadam* courts analyzed the small number of cases that touch on the constitutional question before the Court (albeit with different answers). This Court will now review those cases as well.

In *The Authors League of America, Inc. v. Oman*, 790 F.2d 220 (2d Cir.1986), the Second Circuit held that the manufacturing clause[9] of the Copyright Act of 1976 was constitutional. One of the plaintiffs'

---

7. "The link between bootleg compact discs and interstate commerce and commerce with foreign nations is self-evident." *Moghadam*, 175 F.3d at 1276. *See generally id.* at 1274–77 (analyzing enactment of § 2319A under the Commerce Clause). In its analysis, the Eleventh Circuit relied a portion of the criminal statute, requiring that the unauthorized recording or distribution be done for "commercial advantage" or "financial gain", that does not exist in § 1101. However, the absence of a financial motive in the civil provision would not seem to dramatically decrease the potential commercial impact of bootleggers. "Bootleggers depress the legitimate markets because demand is satisfied through unauthorized channels." 175 F.3d at 1276. For example, the Recording Industry Association of America (RIAA) claims that piracy, including bootlegs, costs the recording industry $4.2 billion worldwide. *See* Recording Industry Association of America: "Anti–Piracy", http://www.riaa.com/issues/piracy.

8. In *United States v. Elcom Ltd.*, 203 F.Supp.2d 1111, 1138–42 (N.D.Cal.2002), Judge Whyte followed *Moghadam* in holding that the enactment of the Digital Millennium

Copyright Act (DMCA) was within Congress' Commerce Clause power due to a lack of any fundamental inconsistency with the Copyright Clause. In *Elcom*, the defendant challenged, on First Amendment and fair use grounds, the DMCA's prohibition of tools used to circumvent copyright protection technology. *Id.* at 1117–21. While the Court does not believe there are flaws in Judge Whyte's reasoning, *Elcom* is not helpful in the instant case because the court never found that the DMCA violated an express limitation of the Copyright Clause, like duration or fixation.

9. The manufacturing clause essentially protects domestic printers by restricting the ability of foreign printers to receive copyright protection for books shipped to the United States. The version of the clause at issue stated: "The importation into or public distribution in the United States of copies of a work consisting predominantly of [nondramatic] literary material that is in the English language and is protected under this title is prohibited unless the portions consisting of such material have been manufactured in the United States or Canada." *Id.* at 221 (citing 17 U.S.C.

constitutional arguments was that Congress exceeded its power under the Copyright Clause because the statute did not promote the progress of the useful arts. *Id.* at 224. The plaintiffs argued, with some intuitive force, that the manufacturing clause did not further the goals of copyright, i.e., the creation of expressive works, but was really mere protectionist legislation. *Id.* Rather than responding to this contention directly, the Second Circuit instead invoked Congress' Commerce Clause power: "What plaintiffs' argument fails to acknowledge, however, is that the copyright clause is not the only constitutional source of congressional power that could justify the manufacturing clause." *Id.* The Second Circuit went on to quickly hold that "denial of copyright protection to certain foreign-manufactured works is clearly justified as an exercise of the legislature's power to regulate commerce with foreign nations." *Id.* While the Second Circuit did view the Commerce Clause as sufficient authority for the manufacturing clause, the court did not hold that the Commerce Clause was sufficient authority for legislation that also violated the limitations of the Copyright Clause.

In *The Trade–Mark Cases,* 100 U.S. 82, 10 Otto 82, 25 L.Ed. 550 (1879), the Supreme Court addressed the issue of whether Congress could constitutionally enact legislation protecting trademarks. In this inquiry, the Court first considered whether Congress exceeded its power provided by the Copyright Clause. *Id.* at 93–94, 10 Otto 82. The Supreme Court was initially skeptical that Congress used its power properly:

> Any attempt, however, to identify the essential characteristics of a trade-mark with inventions and discoveries in the arts and sciences, or with the writings of authors, will show that the effort is surrounded with insurmountable difficulties.

*Id.* at 93–94, 10 Otto 82. Since the Court further held that the "ordinary trade-mark has no necessary relation to invention or discovery," the Court concluded that the Copyright Clause did not provide the necessary authority for federal trademark legislation. *Id.* at 94, 10 Otto 82.

The Supreme Court then turned to the Commerce Clause as an alternative source of legislative power for trademark legislation. However, at that point in time, the Commerce Clause had not reached its modern scope and the Court was then unwilling to provide Congress a great deal of authority under that clause of Article I. For example, the Court stated that: "Every species of property which is the subject of commerce, or which is used or even essential in commerce, is not brought by this clause within the control of Congress." *Id.* at 95, 10 Otto 82. Starting from this somewhat antiquated point of view, the Court unsurprisingly held that the Commerce Clause also did not empower Congress to enact federal trademark legislation. *Id.* at 97–98, 10 Otto 82.

Other cases that address the interaction of the Commerce Clause and other sources of legislative power unfortunately do not discuss the Copyright Clause in particular.

One of the most important cases on this general question is *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). In *Heart of Atlanta,* the plaintiff was the owner of a motel in Atlanta, Georgia that refused to rent out rooms to African–American patrons. *Id.* at 243, 85 S.Ct. 348. To protects its appallingly racist

§ 601(a) (1985)). There were several exceptions to this apparently far-reaching provision of Title 17.

practice, the plaintiff brought several constitutional challenges to Title II of the Civil Rights Act of 1964, the portion of the landmark legislation that prohibits discrimination on the basis of race in the provision of public accommodations. *Id.* at 242–43, 85 S.Ct. 348. Congress based its authority to pass the Civil Rights Act on both its Commerce Clause power and Section 5 of the Fourteenth Amendment.[10] *Id.* at 249, 85 S.Ct. 348. However, the Supreme Court proceeded to focus on Congress' Commerce Clause power rather than Section 5. *Id.* at 250, 85 S.Ct. 348. After further analysis, the Court held that Title II was within Congress' Commerce Clause power. *Id.* at 261, 85 S.Ct. 348.

More recently, the Supreme Court has suggested that the limitations contained in one clause of Art. I, § 8 cannot be subverted by the Commerce Clause. In *Railway Labor Executives' Association v. Gibbons,* 455 U.S. 457, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982), the Court addressed whether the Commerce Clause could be the basis for legislation that would have otherwise violated the uniformity requirement of the Bankruptcy Clause. Article I, Section 8, Clause 4 of the Constitution provides that "Congress has power to enact bankruptcy laws that are uniform throughout the United States." *Id.* at 469, 102 S.Ct. 1169. In holding that the Commerce Clause could not authorize non-uniform bankruptcy legislation, the Court stated that:

> Unlike the Commerce Clause, the Bankruptcy Clause itself contains an affirmative limitation or restriction on Congress' power: bankruptcy laws must be uniform throughout the United States. Such uniformity in the applicability of legislation is not required by the Commerce Clause. Thus, if we were to hold that Congress had the power to enact nonuniform bankruptcy laws pursuant to

the Commerce Clause, we would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws.

*Id.* at 468–69, 102 S.Ct. 1169. After further analysis under the Bankruptcy Clause, the Court held that the challenged statute was insufficiently uniform and therefore outside of Congress' power to enact. *Id.* at 473, 102 S.Ct. 1169. In the Court's opinion, "[t]o hold otherwise would allow Congress to repeal the uniformity requirement from Art. I, § 8, cl. 4, of the Constitution." *Id.*

Based on these cases, this Court holds that § 1101(a)(3) is unconstitutional. While *Authors League* and *The Trade–Mark Cases* would tend to indicate that Congress' powers under the Copyright Clause and the Commerce Clause are nonexclusive, neither of these cases present a conflict between one of the limitations of the Copyright Clause (either fixation or duration) and the Commerce Clause. In *Authors League,* the Second Circuit did not rule on whether the challenged legislation violated one of the limits contained in the Copyright Clause. In *The Trade–Mark Cases,* the Supreme Court held that Congress had insufficient power, under both the Commerce and Copyright Clauses, to enact federal trademark legislation. Similarly, in *Heart of Atlanta,* the Supreme Court did not explicitly hold that Congress exceeded its power under Section 5 of the Fourteenth Amendment and then hold that Congress could enact Title II of the Civil Rights Act pursuant to the Commerce Clause.

Like the *Martignon* court, this Court finds *Railway Labor* to be the most instructive case on this issue. The *Railway Labor* Court examined a clause, like the Copyright Clause, that both provides a positive grant of power and contains an

---

**10.** Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of [the Fourteenth Amendment]."

express limit. In the instant case, allowing Congress to invoke the Commerce Clause in a situation where the Copyright Clause would otherwise be violated would "eradicate from the Constitution a limitation on the power of Congress." *See Railway Labor*, 455 U.S. at 469, 102 S.Ct. 1169. The framers certainly believed that some limit on protection for copyrights and patents should exist; otherwise, they would not have included the explicit limits contained in Art. I, § 8, cl. 8. Permitting the current scope of the Commerce Clause to overwhelm those limitations altogether would be akin to a "repeal" of a provision of the Constitution.[11] *Cf. Graham*, 383 U.S. at 5–6, 86 S.Ct. 684 ("The Congress in the exercise of the patent power may not overreach the restraints imposed by the stated constitutional purpose.").

Thus, since § 1101(a)(3) violates the "for limited Times" requirement of the Copyright Clause and may not be properly enacted via the Commerce Clause, the Court holds that § 1101(a)(3) is unconstitutional.

## CONCLUSION

For the foregoing reasons, the Court DENIES, in part, and GRANTS, in part, Defendants' Motion to Dismiss.

IT IS SO ORDERED.

---

11. In making this ruling, the Court feels compelled to respond to the *Moghadam* court's "fundamental inconsistency" test in more detail. First, in holding that there was no "fundamental inconsistency", the Eleventh Circuit argued that the Copyright Clause's protection of "writings" is "stated in positive terms, and does not imply any negative pregnant that suggests that the term 'Writings' operates as a ceiling on Congress' ability to legislate." 175 F.3d at 1280. This statement is difficult to reconcile with *Railway Labor* since the uniformity "requirement" is similarly a positive statement and does not necessarily imply a negative pregnant, i.e., the Bankruptcy Clause does not state that Congress may not enact non-uniform bankruptcy laws. Second, the Eleventh Circuit surprisingly relied on a constitutionally untested definition of "fixed" in Title 17 to argue that fixation may occur simultaneously with transmission and thus has few boundaries. It is unclear why Congress' definition of "fixed" informs the constitutional definition of fixation since these are distinct inquiries.